**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jerome JACKSON, Defendant-Appellant.**

**No. 77–1796.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1978.

Decided March 29, 1978.

637

Gerald F. Murray, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Candace Fabri, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The defendant was charged in count one of a three count indictment[1] with distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1). Specifically, the defendant was charged with distributing 20 grams of a mixture containing heroin on November 9, 1976. He was found guilty by a jury and was sentenced to five years in the custody of the Attorney General to be followed by the mandatory three year special parole term codified in 21 U.S.C. § 841(a)(1). The district judge suspended execution of that sentence, placing the de-

[1]. Jackson's co-defendant, John Massey, was charged in all three counts; however, he was not tried with Jackson as he was a fugitive at the time of trial. We have been advised that subsequent to the trial from which the present appeal stems, Massey was apprehended and has since pled guilty to two counts of the indictment, including the count naming Jackson.

fendant on probation for a period of five years with the first 120 days to be spent in the Metropolitan Correctional Center.

The defendant appeals on the grounds that the district court erred in admitting evidence of his flight and in instructing the jury on the weight to be given such evidence, that the Government's failure to respond to a bill of particulars deprived the defendant of his right to be apprised of the charges against him and an opportunity to defend against those charges, and that the sentence imposed by the district court was improper.

Although the defendant personally testified at the trial, denying any involvement in the distribution charged in the indictment, taking the evidence in the light most favorable to the Government, it is as follows.

For the better part of the year prior to the November distribution date, the defendant had had a friendly relationship with one Wilson Velasquez, who, unknown to the defendant, had been successfully recruited by federal narcotics agents to act as a confidential informant following his own arrest for selling narcotics to one of the agents. Velasquez did not testify at the Jackson trial. On November 9, 1976, Velasquez called Drug Enforcement Administration (DEA) agent Hacias, and pursuant to a prearranged plan, Hacias obtained $1,050 in official government funds for a proposed drug transaction. Agent Hacias and agent Sanchez met Velasquez who gave them a drug sample which he said he received that morning. Agent Sanchez and Velasquez drove in an undercover government car to the defendant's residence and sounded the horn. Jackson walked out and told them that the man had already called and would call back. When the defendant received the call, he told them to follow him to the EZ Go Gas Station.

When they arrived at the gas station, Jackson said, "The man is here. Be cool. The narcs are around." The defendant then met Massey about one half block from the gas station and together they approached the government car. Massey entered the car where Sanchez and Velasquez were seated. While Massey sold Sanchez 20 grams of a mixture containing heroin, the defendant stood at the side of the car, looking around the area, occasionally poking his head inside the car. Sanchez and Velasquez asked the defendant if he could "do a pound next time," to which the defendant answered that he would work on it. Massey exited the car and met with the defendant briefly before they left the area.

Approximately one week after this transaction, Sanchez called Jackson at his residence, identifying himself as "Ramone," his undercover name. He asked Jackson what had happened to the pound. The defendant responded that he was still checking and would get back to him. Several weeks later, the defendant called Sanchez at the undercover DEA telephone number which he had been given by Sanchez and Velasquez.[2] The defendant said he was "still checking on the thing." A few weeks later, Sanchez phoned Massey at Massey's number. During that conversation Massey said, "Talk to my man, he is over here." Sanchez identified the voice of the person to whom he then spoke as that of Jackson. Again Sanchez inquired about the pound of heroin, and was told that the speaker was working on it. None of these conversations was followed by a transaction.

Pursuant to an arrest warrant, DEA agents Hacias, Streicker, Hayes, and Furay went to the defendant's residence to arrest him on February 17, 1977. At approximately 10:30 a. m. three of the agents knocked at the front door announcing, as they did so, their office and purpose. Meanwhile, Furay had been posted at the back of the residence and he observed the defendant exit through the back door and run down the stairs. Agent Furay yelled "Freeze, Police," whereupon Jackson ran

2. When Jackson was placed under arrest, a paper written by him bearing the DEA telephone number and the name Ramone was taken from him during the process of a search. This was introduced into evidence.

back up the stairs into his apartment where he was arrested.

The defendant first argues that the district court's admission into evidence of his alleged flight and the jury instruction on flight constituted prejudicial error requiring reversal. Although the defendant's explanation of his "flight" was that he ran out the back door to walk his dog, we are of the opinion that the evidence clearly indicates that his conduct can be characterized as an attempt to flee from the authorities.[3] At issue, however, is whether this evidence was erroneously admitted and whether it justified an instruction to the jury that flight may tend to prove consciousness of guilt.[4]

This court has, on numerous occasions, approved the admission of flight evidence under the general rule that flight of the accused may be admissible as evidence of consciousness of guilt and thus of guilt itself. *See, e. g., United States v. Hampton*, 457 F.2d 299, 303 (7th Cir. 1972), *cert. denied*, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101; *United States v. Crisp*, 435 F.2d 354, 359 (7th Cir. 1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *United States ex rel. Miller v. Pate*, 342 F.2d 646, 649 (7th Cir. 1965), *rev'd on other grounds*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). We have never had occasion, however, to define the bounds of this doctrine, nor have we articulated in any depth the analysis underlying our application of it. The present case, which involves Jackson's flight 3½ months after the pertinent crime and without knowledge on his part that he was being sought for the crime, compels us to define more specifically the

scope of the flight doctrine. We are aided substantially in this task by a recent Fifth Circuit opinion.

In *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977), the court stated that the probative value of flight as circumstantial evidence of guilt depends on the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. The court also noted that

> [t]he use of evidence of flight has been criticized on the grounds that the second and fourth inferences are not supported by common experience and it is widely acknowledged that evidence of flight or related conduct is "only marginally probative as to the ultimate issue of guilt or innocence."

*Id.* [citations omitted]. Indeed, the Supreme Court has expressed its lack of confidence in the probative value of flight evidence. In *Wong Sun v. United States*, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963), the Court remarked that

> we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 40 L.Ed. 1051, this Court said: ". . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not

---

3. The defendant's explanation is unpersuasive. The evidence indicated that when he ran out the back door, allegedly going to walk his dog, he was wearing only his pants. The presence or absence of the dog on the day in question was not established although Jackson testified that his dog was in the back and slept by the back door. In any event, Jackson's behavior, occurring while he was practically unclothed, would appear to be unlikely in Chicago during the month of February.

4. The district court used the LaBuy instruction, 33 F.R.D. 586, and instructed the jury as follows:

> Flight of the accused, after a crime has been committed, does not create a presumption of guilt. It is, however, a circumstance which may tend to prove consciousness of guilt, and should be considered and weighed by the jury in connection with all the other evidence. The weight to be given evidence of flight depends upon the motives which prompted it, and all of the surrounding facts and circumstances.

in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' "

In light of this doubt as to the probative value of flight evidence, we are of the opinion that although its use may be proper in many cases, its admission, especially followed by a jury instruction, should be regarded with caution.

Turning to the propriety of its admission and the accompanying jury instruction in the present case, we are immediately troubled by the weakness of the third inference set forth in *Myers,* from consciousness of guilt to consciousness of guilt concerning the crime charged. The defendant's attempt to flee in the present case occurred when the agents knocked on his door just prior to his arrest. This was nearly 3½ months after the crime. The record fails to reflect that Jackson had any reason to believe that he was being sought for the crime charged.

On the occasion of Jackson being sentenced, the district court judge expressed the thought that Jackson had "led a reasonably law-abiding life," that he had three charges but no convictions for felonies. Just why he was "skitterish" of the police and became "quite panicky" when the pounding on his door by the agents occurred, as reflected in his testimony, is at best a matter of conjecture. It is clear, however, that the substantial lapse of time since the happening of the incident at the EZ Go Gas Station diminishes substantially the likelihood that his precipitous departure was equated in his thinking with the earlier incident, irrespective of the extent of his culpable participation in that incident.[5] We do not propose, however, to establish a standard that evidence of flight is properly admitted only if the defendant knows he is being sought for the specific crime charged. *See United States v. Malizia,* 503 F.2d 578 (2d Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed. 843 (1975). But as the interval between the crime charged and the flight expands, evidence of the defendant's knowledge that he is being sought for the crime becomes an increasingly important factor in the propriety of drawing the inference from consciousness of guilt to consciousness of guilt concerning the crime charged.

Thus, it is not surprising that courts addressing the question have placed great significance on the proximity in time of the flight to the crime charged. In *Myers, supra,* the evidence of flight was that federal agents were unable to make contact with the defendant at his residence for three weeks after the crime, that he had his girlfriend bring his clothing from her house to a rendezvous point in a shopping center, that he fled when an unidentified man ran toward him at the shopping center, and that he left the state between three and six weeks after the date of the robbery. In holding this evidence insufficient to support a flight instruction, the court noted that:

> [t]he immediacy requirement is important. It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. *See generally* Hutchins & Slesinger, *Some Observations on the Law of Evidence—*

---

5. This precise problem has been raised as a criticism to the introduction of flight evidence in these circumstances.

> [I]n many situations, the inference of consciousness of guilt of the particular crime is so uncertain and ambiguous and the evidence so prejudicial that one is forced to wonder whether the evidence is not directed to punishing the "wicked" generally rather than resolving the issue of guilt of the offense charged.

McCormick's Handbook of the Law of Evidence § 271 at 655–56 (2d ed. E. Cleary 1972).

*Consciousness of Guilt,* 77 U.Pa.L.Rev. 725, 734–35 (1929). The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.

*Id.* at 1051. Conversely, of course, the importance of the immediacy factor would be greatly diminished, if not rendered irrelevant, when there is evidence that the defendant knows that he is accused of and sought for the commission of the crime charged.

In *United States v. White,* 488 F.2d 660, 662 (8th Cir. 1973), the defendant fled when confronted by a federal agent five months after the crime. There was no evidence that the defendant knew at the time of his flight that he was being sought for the crime charged, nor was the defendant advised that he was accused of the crime when the federal agent confronted him. In these circumstances, the Eighth Circuit found error in the trial court's giving of a flight instruction and stated that if the inference of guilt to be drawn from flight is to have any validity, "the trial court should assure itself that some evidence exists regarding an accusation of the specific crime charged before instructing the jury that flight may be considered in its determination of guilt." *Id.*[6]

■ Although we are unwilling to restrict the scope of the flight doctrine in all cases as severely as did the Eighth Circuit in *White,* in cases in which a defendant's flight occurs a substantial time after the crime, we will place significance on a defendant's knowledge that he is accused of or sought for the crime charged. In such

cases, if there is no evidence, neither direct nor circumstantial, that the defendant had the requisite knowledge, as in the present case, we are of the opinion that giving a flight instruction constitutes error. In the event there is such evidence, and the factual situation otherwise would justify jury consideration, it appears to us that the Devitt and Blackmar instruction is preferable to the LaBuy. That instruction reads in pertinent part:

The intentional flight or concealment of a defendant *immediately after the commission of a crime, or after he is accused of a crime that has been committed,* is not of course sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence.

1 Devitt and Blackmar, Federal Jury Practice and Instructions § 15.08, 460–61 (3d ed. 1977) [emphasis added].

■ The Government argues that certain conversations between the defendant and agent Sanchez which occurred after the crime charged and before the defendant's backdoor departure, in which Sanchez attempted unsuccessfully to get the defendant to sell him heroin, somehow closed the gap between the crime charged and the defendant's flight. Although the Government does not articulate how these two or three drug-related conversations linked the crime charged to the flight approximately two months thereafter, it apparently is suggesting that these conversations, admittedly not constituting a crime, sustained the defendant's consciousness of guilt as to the crime charged so as to neutralize the effects of the 3½ month interval. This theory

6. *Accord Embree v. United States,* 320 F.2d 666 (9th Cir. 1963) (defendant's flight constitutes neither admission nor evidence of guilt because no evidence that he was informed before his flight that he was being sought for the offenses charged). *Cf. Shorter v. United States,* 412 F.2d 428 (9th Cir. 1969), *cert. denied,* 396 U.S. 970, 90 S.Ct. 454, 24 L.Ed.2d 436 (defendant's flight three weeks after bank robbery admissible where, although apparently not necessary, there was "ample evidence to indicate that he

did know he was being sought for the bank robbery").

Some state courts have used the restrictive standard set forth in *United States v. White.* See, e. g., *People v. Harris,* 23 Ill.2d 270, 273, 178 N.E.2d 291, 293 (1961) ("[t]he inference of guilt that may be drawn from flight depends upon the knowledge of the culprit that the crime has been committed and that he is or may be suspected").

might be persuasive if Sanchez had been one of the federal agents who had pounded on the door seeking admission, and if there had been in that event an opportunity for Jackson to identify Sanchez as a part of the group demanding entrance in the name of the law.[7] Sanchez, however, was not involved at the time of the arrest, and therefore we reject the Government's argument.

Having determined that the admission of the evidence and the giving of the instruction was error in the present case, we must further decide whether a reversal is required. Procedurally, as far as the record before us discloses, it would appear that our choice is between harmless or plain error. Rule 52, Fed.R.Crim.P. In the opening statement of the Government counsel, she stated that she expected the evidence to show that on February 17 when Jackson was arrested he attempted to flee. Defense counsel immediately objected on the ground of immateriality. The court indicated he would rule on the evidence when it was offered and the matter was not pursued further.

■ The first prosecution witness was agent Hacias. When his attention was directed to February 17, defense counsel objected to the particular line of questioning and asked to explain his objection at a side bar conference. Such a conference was held but was not stenographically reported. In his reply brief, the defendant asserts that at an unreported side bar conference, presumably the one to which reference has just been made, the trial judge preliminarily overruled the objection. Having neither the nature of the objection nor the judge's ruling before us, we are unable to say that error was preserved by the side bar proceedings. The defendant argues in his reply brief that because of this overruling, it would have been futile to object further. Counsel who desire to place reliance upon

court proceedings should be certain that those proceedings become a part of the record. In any event, when agent Furay testified as to the events on the back steps the testimony went in without objection.

At the time the court considered the objections to jury instructions, the record from the defendant's perspective, was not bettered. The only objection stated was that there was no real evidence of flight, that it would be "stretching the term to consider that a flight." Inasmuch as this ambiguous objection, while perhaps including objection on the basis that Jackson was not fleeing in the legal sense of being conscious of the crime of which he was to be charged, also is certainly susceptible of an interpretation of a claim that the momentary trip down the stairs was not an attempt to avoid the agents. If the judge had so interpreted the objection, he may well have thought that the matter should properly be permitted to go to the jury.

■ It was not until the motion. for a new trial was filed on June 27, 1977, that the defense specifically on the record objected to the flight issue handling on the basis that too much time had elapsed and that the defendant was unaware that he was being accused of the crime with which he was charged at the time of the claimed flight. The district court did not deny the motion for a new trial until August 8, 1977, subsequent to the sentencing (July 25, 1977) and to the filing of the notice of appeal (August 4, 1977). In our opinion, the sentencing should have been deferred until after the rulings on the post-conviction motions,[8] and the motion for a new trial should have been granted. Cf. *United States v. Bell*, No. 77–1794, 572 F.2d 579 (7th Cir. March 2, 1978) (motion to withdraw guilty plea should be ruled on before sentencing).

■ Looking at the record as a whole we are persuaded that under the circumstances

7. After the revelation of Sanchez's true identity, Jackson could have related him to the crime charged and bridged the gap in his thought processes sufficiently to trigger his consciousness of guilt for *that* crime.

8. The defendant had also filed on June 27, 1977, a motion for judgment of acquittal after discharge of the jury.

of this particular case, the error is plain and requires reversal. The trial judge characterized the evidence as circumstantial and equivocal, as indeed it was.[9] The defendant who did testify at the trial emphatically denied any involvement in the use or sale of any narcotics at any time. While this might reasonably be expected if he did take the stand, his testimony was not incredible and the decisive factor in the jury ultimately disbelieving him could well have been because of the flight issue. Finally, and tipping the balance in favor of reversal, is the emphasis on the matter of flight in the final argument of the Government in which it was mentioned at five different points. On one occasion, the evidence was clearly twisted, if not misstated: "Finally, I would mention [10] what he did when he was arrested. He ran. There is little question what he was trying to do." While Jackson made his exit on the morning he was arrested, it was before the officers arrested him. Further in view of the unquestioned law that the flight evidence is only admissible when it has some nexus with the crime charged, the Government's argument after earlier referring to the flight as "a very important piece of evidence," in a final reference put an improper slant on the evidence.

> All the while they [the agents] were there they were saying "Federal agents-Federal agents." This guy was high-tailing it out the back door. Why was he high-tailing it if he didn't do anything? You are not that scared of the police. If police come to your door and you are a law-abiding citizen you let them in and you find out what the problem is.

Aside from the questionable practice of asking the jury to put themselves in the position of a litigating party, the basis for the evidence was not whether he had done "anything." Indeed, even if he were not a law-abiding citizen, and did flee, the evidence thereof would not be proper for consideration unless it had some connection with fleeing to avoid apprehension for the crime as to which the evidence was to be admitted. Otherwise, the flight evidence could be used to punish the "wicked." McCormick, *supra* note 5.

It is unlikely that the other claimed errors will occur in the event the Government elects to continue the prosecution in a new trial.

For the reasons hereinbefore set out the judgment of conviction is reversed and this cause is remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

---

**9.** We note again the efforts of the agents to involve Jackson directly in a transaction. There is an arguable inference from these endeavors that the Government itself regarded the November transaction as borderline insofar as Jackson was concerned.

**10.** Counsel had already devoted earlier in the argument a full paragraph to the flight, occupying some fifteen lines of the transcript. Also the reference lacked finality as it was mentioned three more times.