**STATE of Missouri, Respondent,**

v.

**John W. TURNER, Appellant.**

**No. WD 32141.**

Missouri Court of Appeals,
Western District.

March 2, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 4, 1982.

422

Max Von Erdmannsdorff, Von Erd-mannsdorff & Zimmerman, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Nancy J. Appelquist, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and WASSERSTROM and CLARK, JJ.

SHANGLER, Presiding Judge.

The defendant Turner was convicted for the second degree murder of one Wilma Hopper [§ 565.004] and was sentenced to a term of one hundred years. The victim died from multiple stab wounds. The body was otherwise mutilated by bruises in the pubic area and a laceration of the breast, apparently a bite mark. The defendant contends that the opening statement and final argument of the prosecutor were prejudicial in particulars we treat, and that the admission of certain testimony concerning the dentition of defendant Turner was prejudicial.

On the night of January 11, 1980, Wilma Hopper was found dead in a Kansas City park. The body was discovered sometime after nine o'clock that night by a young couple, Steve Reeds and Denise Dorsel, who drove there to meet another young couple, Mark Chasteen and Kelly Preston. In the park, Steve and Denise saw what appeared to be a red and white blanket, but which on closer examination was the nude body of a dead girl swathed in blood. They informed Mark and Kelly [who were parked close by]

of the discovery, and all four fled from the area in fright. In the course of their conversation, while still in the park, Steve and Denise noticed a green car pull up behind their vehicle. Then, when Mark [who was headed in the opposite direction when he and Steve conversed through the open windows of their cars] started up to leave the park, he passed the green car from a proximity of two feet and saw the face of the driver. Steve also saw that car as it went by his headlights. Mark identified the car as an El Camino or Ranchero, which looked black with gray stripes down the side. Mark identified the defendant unequivocally at a line-up several days later as the person in the El Camino. Steve described the vehicle as dark green with another tone and the driver as a white male with brown hair, mustache and goatee with a dark-colored ball cap decorated with an emblem, atop the head. He was not able to identify the defendant unequivocally as the person at the scene, but at the line-up view "thought [he] looks like the guy I saw." The trial testimony was that the defendant was "very possibly" the same person. Kelly described the car at the scene as a black El Camino [or—at one point—Ranchero] with silver stripes down the side and fitted with Cragar mag [magnesium] wheels. Neither of the girls was able to identify the defendant as the driver of that automobile. The area was illuminated by occasional street lights as well as by the headlights of the cars the youths drove.

The proof at the trial was that the defendant Turner owned a green Ranchero pickup with a silver stripe on the side, fitted with custom-made mag wheels. There was other proof that Turner was married and then divorced from Marilyn, step-sister of the victim, and thereafter was intimate with Juanita Gorman [mother of Wilma and Marilyn]. The police interviewed Turner on January 18th, a week after the body was discovered. In the course of the questions, Turner conceded he knew the victim Wilma, but that he had not seen her for some three years. He recounted the sequence of movements on January 11th, and described his condition as "drunk, drunk." Turner stated

he could not remember the movements of that day during the time he was drinking. When asked "if he was capable of committing the act of the murder of the girl," Turner answered: "If I was drunk, I really don't know." There was other proof that a large clump of pubic hair found in the Turner vehicle under the seat belt retractor matched that of the victim. Other pubic hairs taken from the floor mat and other parts of the vehicle matched hers, also. The blouse of the victim, recovered near the corpse, contained hairs which matched the chest hairs of the defendant Turner. Also, fibers found on the clothing of the victim were identical to fibers from the Turner floor mat. The splatters of blood on the steering column of the Turner vehicle and on a glove found there were of the O type. The victim had type O blood; that of the defendant was type A. Also, a sugary substance found on the jeans the victim wore was identical to a substance found on the seat and articles in the Turner vehicle.

The autopsy disclosed an apparent bite mark on the left breast of the victim. The court ordered the defendant, upon motion and evidence, to submit to dentition impressions. The teeth were inspected, photographed and a cast made. The odontologist who supervised the procedure, Dr. Moore, detected two relatively fresh tooth breaks, no longer than three or four days old, jagged and free from the nicotine and coffee stain that colored the other dentition. In the course of that custody, defendant Turner volunteered to the officer that he broke the teeth on a bone in a plate of beans at the County jail. The expert, Dr. Moore, gave opinion that the breaks he observed were not caused by a bone, since back teeth only, the dentition used for that function, would have been affected.

The prosecutor announced in opening statement that the bite mark found on the victim would match the characteristics of the Turner teeth. As the evidence developed, however, it became apparent that no comparison was possible. The expert [for a reason attributed to a personal distraction] neglected to take a cast of the mark on the

breast of the victim, and a subsequent attempt to correct that lapse by exhumation of the body was made ineffectual by the decomposition of the breast.

The defendant gave evidence of alibi. The jury returned a verdict of guilty and a sentence of imprisonment for one hundred years.

The defendant contends that evidence of the teeth impression regimen undertaken by the court order, the photographs of the dentition the evidence by the expert of a state of the teeth deliberately altered, and all the testimony attendant to that proof was irrelevant and immaterial and prejudicially received because the cast of the teeth was without probative value, since no comparison with the indentation of the breast was possible, and the evidence was otherwise insufficient to show that the defendant deliberately spoiled that evidence.

■ The prosecution motion for discovery against the defendant by an enforced submission to teeth impressions was heard on evidence. The defendant was in attendance. The expert, in response to inquiry by the court, gave details of methods used to alter teeth impressions—among them, impact by a hard utensil. Several days later the defendant was delivered to the odontologist to cast his dentition. Turner was aware of the purpose of that discovery procedure. The expert then detected the new tooth fractures, no more than several days old, and gave opinion that the alteration was by means other than as explained by the defendant—on a bone among the beans he fed on in the jail. The spoliation of evidence evinces a consciousness of guilt and is admissible for that reason. *State v. Quigley,* 591 S.W.2d 740, 742[2–5] (Mo.App.1979). That the altered evidence may not qualify as admissible proof ultimately does not impair its legitimacy on the inference of guilt. That is

because, as in the circumstances here, a defendant who tampers with evidence *he then believes tends to prove guilt* discloses a state of mind that his own cause is weak—and, particularly that element of the proof on which the tamper directly bears. *State v. Hoyel,* 534 S.W.2d 266, 269[3] (Mo.App. 1975); 2 Wigmore, Evidence § 278(2) (Chadbourn rev. 1979).

To sustain the thesis that the ultimate inadmissibility of evidence renders irrelevant proof that the defendant spoiled that evidence, the defendant cites *United States v. Jackson,* 572 F.2d 636 (7th Cir. 1978). That case deals with the inference of guilt from flight from a crime or upon accusation of crime. *Jackson* holds only [l.c. 639[1, 2]] that since the force of the inference depends—in the one instance—upon the *immediacy* of the flight—and in the other instance—the *knowledge* of the defendant that he is accused—a flight from government agents more than three months after the crime and without knowledge that the defendant was sought was not sufficient to raise inference of a consciousness of guilt, and so rendered the evidence of his flight inadmissible.

■ The inference of consciousness of guilt from the spoliation of evidence rests on a foundation not so marginal.[1] A defendant who despoils evidence he knows the prosecution seeks evinces a more certain sense of guilt than one who flees the crime or an attempt to arrest: such an accused actively suppresses evidence of guilt and so displays a consciousness that his cause is weak and allows inference that the cause lacks truth. That a comparison between the cast of the Turner dentition and the bite mark on the body of the victim was not attempted as evidence does not dilute the probative effect of the inference of the consciousness of guilt of a defendant who,

1. Opinion of the United States Supreme Court doubts the probative value of evidence at a criminal trial that the defendant fled the scene of a crime. *Wong Sun v. United States,* 371 U.S. 471, 483, note 10, 83 S.Ct. 407, 415 note 10, 9 L.Ed.2d 441 (1963). That tentativeness rests on the common knowledge that a person who is innocent sometimes will flee from the scene of the crime "through fear of being apprehended as the guilty part[y], or from an unwillingness to appear as [a] witness." *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896).

aware of the prosecution purpose to use that dental impress to prove a fact of guilt, deliberately impedes that purpose by alteration of the teeth configuration by one of the possible means described to the court by the expert in the presence of the defendant.

The defendant complains next that the declaration by the prosecutor in the opening statement—that the expert would give evidence that the Turner dentition was consistent with the bite mark on the victim—was not proven and [a fact then known to the prosecutor], because of the quality of the evidence available, was not susceptible of proof. He contends that the trial court erred by failure to strike the evidence of the expert and to declare a mistrial. The statement of the prosecutor to the jury at the outset of the trial included the remarks:

> "We obtained under Court order, a cast of the defendant's teeth ... Dr. Moore will tell you that with the exception of the chipped portions of the teeth casts, the casts of defendant's teeth, these are consistent with the bite mark that was on the breast of Wilma Hopper ...."

The evidence was, as we noted, that the expert Moore neglected to cast the ostensible bite mark discerned on the breast of the victim, and a later attempt to exhume the remains to accomplish that procedure was not successful. The witness Moore, therefore, ventured no opinion that the Turner teeth matched the bite wound on the victim. The defendant contends that it was error for the court not to declare a mistrial once that lapse of proof became evident. The defendant, however, did not move for mistrial, but only that "all of the testimony of the doctor be stricken" because none of that evidence bore "to prove or disprove any issue of innocence or guilt of [the defendant] in causing the death of Wilma Hopper." That was the sense of the recurrent objections throughout the trial—from the prosecution remarks in opening statement to the testimony of Dr. Moore and others: the defendant insisted that the description of the cast methods, the testimony on the motion for the need for discovery, the exhibits of the Turner dentition and the attendant evidence was simply collateral and irrelevant to any material issue. We rule, however, that the testimony by Dr. Moore and others [aided by the exhibits] that the Turner teeth were freshly broken—and the antecedent circumstances on the motion for discovery when the testimony of the expert as to how dentition could be defaced so as to induce a misimpression virtually charged a primer for despoilment of that evidence—was valid for the inference that the defendant deliberately used one of those alternatives to break his teeth and thereby evinced a consciousness of guilt.

■ The question remains whether, as defendant contends, the prosecutor misdirected the jury to expect proof that the Turner teeth cast were "consistent" with the bite mark on the victim, when the prosecutor "knew or should have known" in the circumstances that "no comparison had been made nor could be made" because of the quality of the prosecution evidence. The prosecutor owes a duty of good faith [and not of reasonable care as the contention, as articulated, suggests] that the material facts described in the opening statement will be proved by evidence. A prosecutor who deliberately promises proof of evidence altogether inadmissible acts in bad faith. *State v. Browner*, 587 S.W.2d 948, 953 (Mo.App.1979). The opening statement serves to advise the jury of the facts the prosecution expects to prove and to enable the defendant to fairly meet the charge. *State v. Deppe*, 286 S.W.2d 776, 779[5] (Mo. 1956). The prosecutor owes no prediction of detail but only a general delineation of the case. Thus, the mere neglect to adduce evidence as to some of the facts predicted does not constitute prejudice—unless the prosecutor never intended to present the evidence or actually knew he could not support that declaration of proof. *State v. Horn*, 498 S.W.2d 771, 774[1] (Mo.1973).

■ The opening statement of the prosecutor promised evidence that the Turner dentition as cast was "consistent" with the bite mark on Wilma Hopper. The defendant interpolates that statement into a decla-

ration that the prosecution would prove the cast of the Turner teeth "compared" with the bite laceration on the victim. We perceive the representation that the cast was *consistent* with the bite mark found is a commitment to a proof more general than that the Turner dentition and the mark on the victim *compared.* We assume for the purpose of contention that a *consistency* and a *comparison* are equivalent and determine, nevertheless, that the defendant suffered no prejudice from that lapse of proof.

Indeed, the prosecutor never attempted to elicit from the expert that the mold of the Turner teeth taken under court order compared with the bite impression on the breast of the victim or that they were even consistent.[2] When that impasse of proof became evident,[3] the defendant moved that "all of the testimony of the doctor [expert Moore] be stricken"—a request properly denied because much of that testimony bore on the defacement of his teeth by the defendant about to submit to the discovery order. There was no motion for mistrial. To allay whatever of the evidence remained deleterious, the court allowed the defendant to cross-examine the expert beyond the scope of the direct inquiry as to whether he formed an opinion that the cast of the Turner teeth compared with the bite mark on the victim. The defendant exploited that overture to ask only whether the expert instructed his students "in accordance with Dr. Irving Soaper's findings [an authority in the field] that the misuses of this kind of evidence could very easily implicate a nonguilty party?" To which expert Moore responded: "Do I tell them that? Yes, I do." Then, at submission, the court

formally withdrew from the jury consideration "[a]ny evidence concerning the comparison of a bite mark and defendant's teeth."

In fact, the inability—and hence failure—of the prosecution to produce the evidence announced at the outset was no surprise at all to the defendant. The opening statement of the defendant reveals that much:

"When you get all done, this man, Dr. Moore, said he couldn't really tell [if the bite impression matched the teeth]; so you talk to somebody else in another state for six hours [an allusion to consultation by the expert with another expert] another odontologist, who apparently refused to testify after they exhumed the body. Finally, he said, 'I have got sort of an opinion in this case.'" [parenthetical comment added]

The failure of the prosecutor to make that proof, therefore, was not an impediment to a fair defense.

The question persists, nevertheless, whether the promise to make that proof so directed the expectations of the jury so as to induce their belief that the Turner dentition matched the bite mark even without actual evidence of that material fact. If so, then the defendant was prejudiced. The opening statement of the defendant revealed a familiarity with the prosecution case[4] which was fulfilled in detail at the trial: that expert Moore came to realize the failure to cast the bite mark on the victim impaired the basis to give opinion of comparison, that consultation with a more established expert advised exhumation of the body for that purpose, the failure of that attempt, and the ultimate want of devel-

---

**2.** The expert, Dr. Moore, did give evidence that the wound on the breast of the victim appeared to be a bite mark, but that opinion was from visual observation—aided by photographs—and was neither a comparison nor a conclusion of consistency.

**3.** The prosecutor concluded direct examination without attempt to elicit an opinion from the expert of a comparison between the Turner cast and the mark on the victim—that for the reason that the expert [whose testimony was the first he had given in that role] had neglected to take a cast of the bite mark on the victim

and a later attempt after exhumation was nullified by decomposition of the body—he asked the court to prohibit the defense to cross-examine on that subject as outside the scope of the direct examination. The court disallowed the objection and sanctioned inquiry by the defense.

**4.** We assume that the information was garnered through discovery as well as from the evidence given at the pretrial hearings on the motions to take dental impressions and, later, to suppress some of that evidence.

oped evidence at the trial to attempt the predicted opinion. We must, and do, assume that the prosecution knew at least as much about its own evidence. The mere neglect to prove a fact announced in the opening statement does not inherently constitute prejudice. *State v. Horn,* 498 S.W.2d 771, 774[1] (Mo.1973). In this case, the promise of evidence of comparison was solitary. The prosecution managed the trial, however, on a premise that the evidence would yield an inference that the Turner dental indentation matched the bite mark on the victim. To that end, the discovery procedure to subject the defendant to a dental cast, the repetition to the jury of the evidence taken on that motion, the details of the cast process related by expert Moore to the jury, the adjunctive testimony of the police officers, and the photographs and other exhibits were all directed. That vagary ended only when the prosecution disclosed at the end of the Moore testimony that the expert would make no attempt to offer opinion that the Turner dentition compared with the mark on the victim and requested the court to deny the defense inquiry into that subject as beyond the scope of direct examination.

Were the bad faith of the prosecutor the only determinant, reversal of conviction would be foregone. There remains to consider prejudice to the defendant: whether the trial was made unjust by that opening statement and by some neglect of the court to redress that error. *State v. Browner,* 587 S.W.2d 948, 956[17] (Mo.App.1979). We restate, first of all, that when the prosecutor finally conceded the lack of evidence to prove comparison, the court nevertheless allowed the defendant to cross-examine the witness on the weakness of that evidence. We restate also that the defendant at no time requested redress by mistrial. Rather, the only remedy invoked at the trial was to strike the testimony of the expert altogether—an objection too inclusive, since that testimony validly bore on the intention conduct of the defendant to mar his dental configuration and so to distort discovery, and hence to prove the consciousness of guilt. Then, the court withdrew from the jury consideration of the expert evidence as proof of a comparison of the Turner dentition with the bite mark on the victim. These remedies by the court were commensurate with the error. In addition, the defendant in final argument exploited the prosecution lapse of the promised proof—in itself some redress of error. *State v. Levy,* 262 Mo. 181, 170 S.W. 1114, 1117[7, 8] (1914); *State v. Feger,* 340 S.W.2d 716, 725 (Mo.1960).

The strength of the other, lawful, evidence of guilt also weighs against prejudice and reduces the prosecutorial misconduct to harmless error. *State v. Degraffenreid,* 477 S.W.2d 57, 64[14, 15] (Mo. banc 1972); *State v. Browner,* 587 S.W.2d 948, 956 (Mo.App. 1979). The defendant and vehicle were identified at the scene; his automobile was strewn with the pubic and cranial hairs of the victim—on the floor mat, under the seat belt retractor, and elsewhere—the blouse of the victim contained hair which matched chest growth on the defendant; fibers on the clothing of the victim matched the construction of the truck mat; blood inside the Turner vehicle matched the blood type of the victim; a sugary substance found on the jeans of the victim matched the substance found in the car interior; the defendant personally knew the victim [found dead and physically assaulted]—had been married to her step-sister, and then carried on a liaison with the mother. This cogent evidence of guilt and the ready correction by the trial court of the objection reduced the prosecutorial misconduct to a nonprejudicial effect.

■ The defendant contends also that the final argument of the prosecutor was a contrived narrative of the crime and that such speculations inflamed the jury to return a one-hundred-year sentence.

The evidence of guilt, albeit abundant, was circumstantial. The defendant spoke to the police of his activity on the day of the homicide, but on the night of the event, Turner [in his own words] was "drunk, drunk" and had no memory of his movements. The prosecutor undertook to inter-

stice the evidence into a sequential narrative. In preface to argument, the prosecutor offered to aid the jury to come to the inferences implicit in the evidence:

What I am about to say to you is what I suggest to you the evidence has shown, when you take into account the reasonable inferences as well. I am not saying you have to adopt it in order to find the Defendant guilty. There are many other theories, perhaps, of his guilt, but I am offering it to you by way of aid.

Then the prosecutor commenced to intimate how the evidence could be understood.

I suggest to you what happened on Friday, January 11, 1980, was that John Turner somehow, either found out this Wilma Hopper was back in town, or decided, because his girlfriend had gone to work and he had been drinking, or for whatever reason, to pay one of those unannounced, unexpected visits on Juanita Gorman, and he went over there; and when he knocked on the door, whether he was expecting to see Wilma or not, he did, and she was alive.

Of course, he used to be family—

The defendant objected to the comments as without support in the evidence, and as speculation and conjecture. The court overruled the objection, and the argument proceeded to conclusion.

The contention is that the argument of the prosecutor was nothing more than a speculative delve into the thoughts and motives of the defendant, without basis in evidence, and therefore erroneous. The complaint is without merit. There was evidence that the victim had returned to the city a few weeks earlier and stayed at the residence of the mother, Juanita Gorman. The defendant, by his own statement, was without the company of his usual female companion that evening—since she was at work—and he occupied the day in drink. There was also evidence that in the past he dated the mother and made unannounced

visits to her home. Thus, the salient facts of the narrative not only rest on evidence, but also justify the inference that the victim came into the company of the defendant that evening under just such auspices, as the prosecutor suggested.

A counsel must conform jury argument to the facts in evidence. *State v. Cuckovich*, 485 S.W.2d 16, 27[21, 22] (Mo. banc 1972). However, final argument may exploit the legitimate inferences which the evidence yields, and to that end the law allows a prosecutor wide compass for comment. *State v. Tate*, 468 S.W.2d 646, 650[5] (Mo.1971). Thus, although the argument must rest on the evidence, counsel may draw nonevidential conclusions fairly justified as inferences from the evidence. *State v. McKeever*, 339 Mo. 1066, 101 S.W.2d 22, 31[25] (1936); *State v. Bailey*, 526 S.W.2d 40, 43[4–7] (Mo.App.1975). It was open to the prosecutor to argue that the otherwise random circumstantial evidence fell into a rational order of occurrence—the extent the reasonable inferences of the proof allowed. The trial court deemed the argument valid within these principles, and we agree.[5] The heavy sentence was not an inflamed response to the argument [as the defendant suggests], but more likely, to the savagery of the offense and to the proof of guilt.

The judgment of conviction is affirmed.

All concur.

---

5. The brief cites other instances of prosecutorial final argument as beyond the evidence, speculative and contrived. The objection at the trial, however, was confined to the single instance we treat and any other such impropriety was not preserved for review. *State v. Martin*, 484 S.W.2d 179, 180[1, 2] (Mo.1972).