836 F.2d 368
 24 Fed. R. Evid. Serv. 642
 UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel Joseph KORD, a/k/a Daniel Kirkland and Daniel Allen,
and Thomas David Mangum, a/k/a Steve Neal Kirby,
Steven Neal Kirby, Allen Hamburger and
Thomas David Riley,
Defendants-Appellants.
 Nos. 86-1329, 86-1545.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1986.
Decided Jan. 12, 1988.
Rehearing Denied in No. 86-1329 March 7, 1988.
 
 1
 Spencer Lee Daniels, Michael E. Brandt, Peoria, Ill., for defendants-appellants.
 
 
 2
 Lee Smith, Asst. U.S. Atty. (Gerald D. Fines, U.S. Atty.), Peoria, Ill., for plaintiff-appellee.
 
 
 3
 Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*
 
 
 4
 WILLIAM J. CAMPBELL, Senior District Judge.
 
 
 5
 A jury convicted defendants/appellants Daniel Joseph Kord and Thomas David Mangum of robbery and armed robbery of a federally insured savings and loan in violation of 18 U.S.C. Secs. 2113(a) and 2113(d), respectively. Sentences were entered only on the armed robbery convictions, robbery being a lesser included offense of armed robbery. Sentences of twenty years and twenty-five years incarceration were given to Kord and Mangum, respectively, on the armed robbery convictions. The jury also convicted Mangum of carrying a firearm during the commission of a crime of violence in violation of 18 U.S.C. Sec. 924(c) and possession of a firearm by a convicted felon in violation of 18 U.S.C. App.II Sec. 1202(a) (repealed). Mangum received a sentence of five years without parole for the carrying of a firearm during the commission of a crime of violence conviction. The sentence runs consecutively with his armed robbery sentence and concurrently with a two year sentence for the possession of a firearm by a convicted felon conviction. As set forth below, we affirm the judgment of the district court.
 
 I.
 
 6
 On August 6, 1985, two masked men robbed the federally insured Citizens Savings and Loan Association of Eureka, Illinois at approximately 1:30 p.m. They stole $19,844 including "bait" money from the teller drawers. One of the men was armed with a shotgun. He wore a brown print shirt and a baseball cap with a spotted camouflage design imprinted upon it. His accomplice was shorter and wore a similar style shirt and a White Sox baseball cap.[1] The "Sox" cap and one nylon-stocking mask were dropped near the door of the savings and loan as the men fled the crime scene.
 
 
 7
 Ruthanne Edgeton, a savings consultant for the savings and loan, testified that after the two men left the building she observed an unmasked man as he ran past a driveup teller window. She testified that the man she saw resembled defendant Kord.
 
 
 8
 Larry Fritz testified that he saw two men running through an alley near the savings and loan soon after the robbery was committed. Fritz was driving near the crime scene and observed the two men flee in a yellow automobile. He wrote down that the yellow vehicle's license plate number closely resembled GYI-2448.
 
 
 9
 Sergeant Shoemaker of the Eureka Police Department testified that at approximately 4:45 p.m. on August 6, he drove to the Enchanted Gardens Trailer Court and saw several people standing around two vehicles--a yellow car and another small brown foreign car. The yellow car's trunk was open. Shortly thereafter, the two vehicles left the trailer camp and Sergeant Shoemaker followed them as they drove southbound on Route 117.
 
 
 10
 Illinois State Police Trooper James Cooper was in uniform and driving an unmarked squad car when he observed both vehicles at an intersection on Route 117 at approximately 5:15 p.m. on August 6. They were only a few miles south of Eureka. Cooper observed the yellow car's license plate number was GYI-824. An individual, later identified as defendant Mangum, jumped out of the yellow vehicle and went up to the small brown car parked in front. Soon thereafter, Cooper followed both cars into a gas station.
 
 
 11
 Cooper made eye contact with defendant Kord, the driver of the small brown automobile. At that point, Kord began to drive out of the gas station, motioning toward the state trooper's direction as he passed defendant Mangum. Both vehicles left the gas station.
 
 
 12
 State and local law enforcement officers stopped the yellow automobile in which Mangum was a passenger at approximately 5:45 p.m. The car's owner and driver was Mangum's girlfriend Judy Sniff. Mangum consented to the search of the vehicle and the officers found: a shotgun; a shirt similar to the one described by witnesses in the savings and loan robbery; a camouflage spotted baseball cap; and $9,404 including "bait" money in the automobile's trunk. Gov't Br. at 6. Mangum also possessed on his person approximately $2,030 which included more "bait" money.
 
 
 13
 Subsequently, at 8:45 p.m. on August 6, law enforcement officers drove to Kord's residence in the Enchanted Gardens Trailer Court. Kord's wife signed a consent to search form and the officers searched the trailer and her small brown foreign automobile. Kord Br. at 14. The officers found approximately $6,870 which included "bait" money from the savings and loan robbery. This money was discovered in a small gray metal box in the Kord trailer. Cancelled checks and banking statements of Kord and his wife were also in the box.
 
 
 14
 Kord's neighbor, Adrien Gazelle, testified that on August 6, 1985 the Kords had three visitors, a couple and a little boy. Gazelle's twelve year old son testified that he saw Mangum leave with Kord in a yellow car between noon and 12:15 p.m. on August 6. The boy saw them return on foot two or three hours later and Mangum left shortly thereafter. Adrien Gazelle testified that both couples left the trailer park in their respective vehicles at approximately 4:30 p.m.
 
 
 15
 Gloria Patterson, an acquaintance of the Kord family, testified that she called the Kord residence on August 6 prior to the time of the savings and loan robbery. Mangum's girlfriend, Judy Sniff, answered the telephone.
 
 
 16
 After Mangum was taken into custody, FBI Agent Leuck interviewed him at the Woodford County Jail on August 6 at approximately 7:00 p.m. Agent Leuck introduced himself and told Mangum that he was under arrest for the robbery of the Citizens Savings and Loan Association of Eureka, Illinois which had occurred earlier that day. The defendant was asked if he could read, write and understand English. Mangum answered that he could do so. Mangum Br. at 8, 15. Agent Leuck then gave Mangum an Advice of Rights form to read. The defendant took a few minutes to read the form and when asked to sign the form Mangum stated, "No, I never sign anything." Mangum Br. at 9.
 
 
 17
 At this point, Agent Leuck told the defendant, "We want to make sure that you understand." Leuck went on to caution him, "You have the right to remain silent; anything that you say may be used against you; make sure you understand." The defendant was advised that an attorney would be appointed to represent him, if he could not afford to hire one. Furthermore, Agent Leuck told Mangum, if at any time he wanted to stop talking, Leuck would stop asking questions. Gov't Br. at 25.
 
 
 18
 Mangum was asked, "Would you like to go ahead and talk to us without signing the form?" The defendant admits that he replied, "Sure, why not." Mangum Br. at 9.
 
 
 19
 At that point Mangum gave an oral confession as to his involvement with the savings and loan robbery. In his statement, the defendant said that a person known only to him as "John" helped him commit the robbery. Mangum also confessed that he used the shotgun in the robbery as his accomplice jumped over the counter to get the money. Furthermore, he confessed that they fled the crime scene in a yellow automobile owned by his girlfriend, Judy Sniff.
 
 
 20
 Agent Leuck testified that he and other law enforcement officers periodically checked the Kord trailer for several days following the robbery. No one answered the door on these visits. Kord's wife had moved to Bloomington, Illinois. Ultimately on November 14, 1985, Kord surrendered to law enforcement officers in Phoenix, Arizona.
 
 II.
 A. Defendant Kord
 
 21
 Defendant Kord raises five arguments on appeal. As a threshold matter, we note that our jurisdiction governing both defendants' appeals is pursuant to 28 U.S.C. Sec. 1291. Kord's first argument is that a reasonable jury could not convict him based upon the evidence presented at trial. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); see also Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); and United States v. Brack, 747 F.2d 1142, 1148 (7th Cir.1984).
 
 
 22
 Defendant Kord's neighbors testified that they observed Mangum and Kord together at Kord's residence on August 6, 1985. The defendants were observed leaving Kord's residence in a yellow automobile between noon and 12:15 p.m. The robbery of the Citizens Savings and Loan Association of Eureka, Illinois occurred at approximately 1:30 p.m. There was testimony from a savings and loan employee that one of the robbers resembled Kord. An eyewitness testified that the yellow getaway vehicle's license plate number closely resembled GYI-2448. The license plate number of the yellow automobile owned by Mangum's girlfriend is GYI-824. A Kord family acquaintance testified that Mangum's girlfriend answered the telephone at the Kord residence on August 6.
 
 
 23
 Furthermore, an Illinois state trooper observed Mangum and Kord together in a gas station a mere few hours after the robbery. Kord made eye contact with the uniformed officer and then motioned to Mangum about the officer's presence. Law enforcement officers stopped Mangum's vehicle shortly thereafter and after obtaining his consent to search the vehicle found a shotgun, $11,434 including "bait" money from the robbery and other incriminating evidence. When officers searched Kord's residence pursuant to the consent of Kord's wife, $6,870 including "bait" money from the robbery was discovered with Kord's personal papers. Kord's wife moved to another town soon after the robbery and Kord turned himself in three months later in Phoenix, Arizona. We conclude that viewed in the light most favorable to the government, there is substantial evidence to uphold the jury's conviction of Kord.
 
 
 24
 Kord's next argument is that the trial court erred in admitting evidence of his flight. "It is well-settled in this circuit that 'evidence of flight and concealment is admissible to show consciousness of guilt, as well as guilt itself.' " United States v. Zabic, 745 F.2d 464, 471 (7th Cir.1984) citing United States v. Solomon, 688 F.2d 1171, 1176 (7th Cir.1982); and United States v. Jackson, 572 F.2d 636, 639 (7th Cir.1978). See also United States v. Lewis, 797 F.2d 358, 368 (7th Cir.1986). The probative value of flight as circumstantial evidence of guilt--
 
 
 25
 depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
 
 
 26
 Jackson, 572 F.2d at 639. See also United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977).
 
 
 27
 In the present case, the degree of confidence with which the Kord jury could reasonably draw inferences from Kord's behavior to an ultimate finding of his guilt is substantial. Neutral witnesses observed Kord with co-defendant Mangum mere hours before and after the robbery at Kord's residence. State Trooper James Cooper observed the defendants in a suspicious two car gas station rendezvous less than an hour before law enforcement officers found a shotgun, "bait" money and other incriminating evidence in Mangum's vehicle and on his person. "Bait" money was also found in Kord's residence on August 6. Kord's wife moved shortly after the robbery and there was no evidence that defendant Kord was ever seen at the Enchanted Gardens Trailer Court residence after August 6. There is evidence, however, that Kord surrendered to police in Phoenix, Arizona on November 14, 1985.
 
 
 28
 A jury was entitled to consider the inferences from such an absence and consider its weight to the actual guilt of the defendant as to the crime charged. Defendant Kord had ample opportunity to rebut the government's charges that he was avoiding federal law enforcement officers. We conclude that the trial court's admission of flight evidence regarding Kord was proper.
 
 
 29
 Kord argues that the trial court erred in admitting Ruthanne Edgeton's identification evidence. At the government's urging, witness Edgeton looked through a courtroom window to see if she could identify either defendant. This was done contrary to a court order barring witnesses during the trial proceeding.
 
 
 30
 The test we must apply to determine if a defendant's procedural due process rights have been violated by an unconstitutionally suggestive identification procedure is a well settled two-part inquiry. United States ex rel. Kosik v. Napoli, 814 F.2d 1151, 1155 (7th Cir.1987). First, we must determine if the procedures used at the federal district court below were unduly suggestive. Second, if the procedures were unduly suggestive we must determine if an identification is so unreliable under the totality of the circumstances that it creates a very substantial likelihood of irreparable misidentification. Kosik, 814 F.2d at 1155; Manson v. Braithwaite, 432 U.S. 98, 109-14, 97 S.Ct. 2243, 2250-53, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 198-99, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). We believe the government's conduct below was inappropriate and conclude that it was unduly suggestive.
 
 
 31
 Our second inquiry is to determine if witness Edgeton's identification of Kord was so unreliable under the totality of the circumstances that it created a very substantial likelihood of irreparable misidentification. Witness Edgeton's trial identification occurred several months after the robbery. She told law enforcement authorities at the robbery scene that after the two robbers left the building, she observed one of them as he went past the drive-up teller window. She saw his profile as he ran past the window and the man was not wearing a mask. When witness Edgeton testified, she stated that Kord resembled the man who ran past the teller window. Kord Br. at 7. Edgeton's identification of the defendant at the trial below was not overwhelmingly different than her observations on the robbery date. She did not make a positive identification on August 6, 1985 nor at trial. She merely testified that Kord resembled one of the robbers. The jury was able to weigh her inability to make a positive identification with other evidence heard at the trial. We do not find that Edgeton's identification was so unreliable under the totality of the circumstances that it created a very substantial likelihood of irreparable misidentification. In fact, the defendant's trial counsel tried to use witness Edgeton's inability to make a positive identification of Kord to the defendant's advantage. In his closing argument, Kord's trial counsel stated, "She saw a profile, and that profile resembled him [Kord]. And you are going to convict Daniel Kord on that?" Kord Br. at 17.
 
 
 32
 Further, the reality is that there is substantial evidence beyond witness Edgeton's testimony to conclude that a reasonable jury would convict defendant Kord. See our discussion supra. We reject any argument by Kord that the Edgeton identification testimony was the pivotal issue as to his conviction. There was no constitutional error in admitting the trial identification.
 
 
 33
 Defendant Kord argues that pursuant to Fed.R.Crim.P. 14 the trial court erred when it did not allow his motion for severance. Kord stated in his motion that he thought co-defendant Mangum would submit testimony to the jury of Kord's innocence. The defendant's argument is based on a statement from Mangum to FBI Agent Leuck that an individual named "John" was his accomplice. Co-defendant Mangum used his Fifth Amendment privilege and never testified.
 
 
 34
 In United States v. Bruun, 809 F.2d 397, 407 (7th Cir.1987) this Court held that, "A refusal to grant a severance will be disturbed on appeal only if it results in manifest and substantial prejudice; in other words, it is reviewable only for abuse of discretion." The mere possibility of a co-defendant's testimony has been found to be insufficient grounds for severance. See United States v. Pavelski, 789 F.2d 485, 491 (7th Cir.1986); see also United States v. Harris, 542 F.2d 1283, 1312-13 (7th Cir.1976). Substantial prejudice has not been advanced by Kord. Therefore, the defendant's argument remains unsubstantiated. We see no abuse of discretion. Further, it appears Mangum's testimony was exculpatory, further complicating Kord's efforts to demonstrate that substantial prejudice occurred from a failure to sever.
 
 
 35
 Defendant Kord's final argument is that the trial court erred in refusing to ask particular questions proposed by defendant's counsel for the voir dire. In United States v. Thompson, 807 F.2d 585, 590 (7th Cir.1986), this Court held,
 
 
 36
 The court is not required to ask any particular questions proposed by counsel, United States v. Verkuilen, 690 F.2d 648, 660 (7th Cir.1982), and is accorded broad discretion in conducting the voir dire. Ham v. South Carolina, 409 U.S. 524, 528, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (1973). As a general matter, voir dire ... need only provide "some basis for a reasonably knowledgeable exercise of the right of challenge whether for cause or peremptory."
 
 
 37
 (quoting United States v. Jackson, 542 F.2d 403, 413 (7th Cir.1976)). See also United States v. Hasting, 739 F.2d 1269, 1273 (7th Cir.1984).
 
 
 38
 In the instant case, Kord's counsel proposed that the following questions be asked during the voir dire:
 
 
 39
 No. 22 Do any members of the jury panel think that the Defendant is guilty of the crime with which he is charged at this time?
 
 
 40
 No. 24 Does any member of the panel feel that the Defendant must be guilty of something or he would not be on trial?
 
 
 41
 We note the trial court did ask the jury if any members of the panel had formed any conclusions in their minds as to the guilt of the defendant which would take the presentation of evidence to remove. Gov't Br. at 20. This question is not materially different from the language proposed in defense counsel's questions Nos. 22 and 24.
 
 
 42
 This court will not find a trial court abused its discretion in conducting voir dire where there is "sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right to challenge."
 
 
 43
 United States v. Hasting, 739 F.2d 1269, 1273 (7th Cir.1984) (citing United States v. Martin, 507 F.2d 428, 432 (7th Cir.1974)) (quoting United States v. Lewin, 467 F.2d 1132, 1137 (7th Cir.1972)). There was no deficiency in the questions posed in the instant case, since they clearly permitted the knowledgeable exercise of for cause or peremptory challenges. The trial court's questions to the jury enunciated above addressed the same basic concerns as to bias as defendant's proposed voir dire questions. We find no abuse of discretion.
 
 B. Defendant Mangum
 
 44
 Defendant Mangum raises two issues on appeal. The first is that Mangum's oral confession was obtained in violation of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Connecticut v. Barrett, --- U.S. ----, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) the Supreme Court held, "The fundamental purpose of the Court's decision in Miranda was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.' " (quoting Miranda, 384 U.S. at 469, 86 S.Ct. at 1625 (emphasis in original)). See also Colorado v. Spring, --- U.S. ----, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987). The Court also held that, "Nothing in our decisions, ... or in the rationale of Miranda, requires authorities to ignore the tenor or sense of a defendant's response to [Miranda ] ... warnings." Barrett, 107 S.Ct. at 831. In Barrett, the defendant refused to give a written statement unless his attorney was present, even though he "had no problem in talking about the incident." Id. at 830. The Supreme Court held that the defendant had not invoked his right to counsel for all purposes, and that he acquiesced to the oral interrogation. Id. at 832.
 
 
 45
 In the present case, FBI Agent Leuck asked Mangum if he could read, write and understand English. The defendant replied affirmatively. Mangum was given a Miranda Advice of Rights form to read. After Mangum read the form he was asked to sign it. The defendant replied, "No, I never sign anything." Mangum Br. at 9.
 
 
 46
 Agent Leuck cautioned Mangum, "We want to make sure you understand." Id. Leuck then went on to verbally explain all of Mangum's Miranda rights. Gov't Br. at 25. The defendant was then asked, "Would you like to go ahead and talk with us without signing the form?" Mangum admits he told Leuck, "Sure, why not." Mangum Br. at 9. The defendant then gave an oral confession to his involvement in the robbery.
 
 
 47
 We rule Mangum confessed voluntarily. The interviewing agent was not required to ignore the sense of defendant's response to the Miranda warnings. Furthermore, we believe Mangum's waiver was made with full awareness of both the nature of his rights to be abandoned and the consequences of his decision to abandon them.[2]
 
 
 48
 In Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) the Supreme Court held, "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)). Mangum was informed about his Miranda rights both verbally and in writing. Furthermore, there is no evidence that he was "threatened, tricked or cajoled" into this waiver. Miranda, 384 U.S. at 476, 86 S.Ct. at 1628. See also Colorado v. Connelly, 479 U.S. ----, ----, 107 S.Ct. 515, 523-24, 93 L.Ed.2d 473 (1986). Miranda gives a defendant a right to choose between speech and silence and Mangum chose to speak. See Barrett, 107 S.Ct. at 832.
 
 
 49
 In North Carolina v. Butler, 441 U.S. 369, 370-71, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979), the Supreme Court held that when an FBI agent had fully advised a suspect of his Miranda rights, gave him an Advice of Rights form to read and sign and told the suspect he neither had to speak nor sign the form, the suspect's inculpatory remarks were admissible as evidence despite the suspect's statement, "I will talk to you but I am not signing any form." Butler, 441 U.S. at 371, 99 S.Ct. at 1756. See also United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir.1987). We find a similar situation in the case at bar. Mangum's Miranda argument is without merit.
 
 
 50
 Defendant Mangum's final argument is that the trial court erred in admitting evidence of his prior conviction as proof of his guilt to the possession of a firearm by a convicted felon charge.[3] The defendant relies upon Illinois case law which holds that the only proper manner to prove a prior conviction is through documents which, at minimum, contain the following: (1) a caption; (2) the entry showing the return of the indictment in open court by grand jury; (3) the indictment and record of arraignment; (4) the impaneling of the jury or waiver of the jury; (5) the jury verdict; and (6) the final judgment of the court. See People v. Novak, 343 Ill. 355, 175 N.E. 551 (1931); see also People v. Robbins, 88 Ill.App.2d 447, 232 N.E.2d 302 (1967).
 
 
 51
 Assuming arguendo that the defendant's checklist were to be adopted by this Court, each "Certified Statement of Conviction" form offered by the government to the trial court satisfies the checklist requirements. Each statement includes: (a) a caption identifying Mangum as the defendant; (2) an entry showing return of a grand jury indictment on November 21, 1975; (3) arraignment before Judge Joseph A. Power on December 12, 1975; (4) a plea of guilty to armed robbery (thereby negating the need for a jury or jury verdict); and (5) the final judgment of Judge Frank J. Wilson on July 7, 1976 and August 4, 1976, respectively. Furthermore, each "Certified Statement of Conviction" form was signed by a person authorized to make certification; the Clerk of the Circuit Court of Cook County, Morgan M. Finley. Clerk Finley dated form numbers 75-7161 and 75-7162 on October 15, 1976. Mangum Br. appendix at 5-8. The signed forms were public records and pursuant to Fed.R. of Evid. 902(4) they were properly admitted by the trial court as evidence of Mangum's prior conviction. There was no abuse of discretion by the trial court. Accordingly, the trial court's decision is
 
 
 52
 AFFIRMED.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Mangum is 5' 11"" and Kord is 5' 6"". Kord Br. at 14, 17
 
 
 [2]
 Defendant Mangum contends that the waiver of his Miranda rights was tainted because he was a drug abuser. The defendant admits, however, that Agent Leuck testified that Mangum told Leuck on August 6, 1985 that he had not used drugs in a day or so. Furthermore, Agent Leuck testified that the defendant did not appear to be under the influence of drugs. Mangum Br. at 10. Sergeant Bill Myers of the Woodford County Sheriff's Department observed the Mangum interview and the defendant had ample opportunity to call him as a witness to substantiate his claim. Defendant Mangum chose not to do so and we find his allegation unconvincing
 
 
 [3]
 The import of Mangum's argument wanes upon noting that his two year sentence for possession of a firearm by a convicted felon runs concurrently with his twenty-five year armed robbery sentence. Nonetheless, Mangum's argument is without merit