**Douglas G. DEAN, Petitioner-Appellant,**

v.

**Warren YOUNG, Warden, Waupun Cor-
rectional Institute, and Bronson C. La-
Follette, Attorney General of Wiscon-
sin, Respondents-Appellees.**

**No. 85–1070.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1985.

Decided Nov. 26, 1985.

James C. Reiher, Perry, First, Reiher, Lerner & Quindel, S.C., Milwaukee, Wis., for petitioner-appellant.

David J. Becker, Atty. Gen. Wis., Dept. of Justice, Madison, Wis., for respondents-appellees.

Before EASTERBROOK and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Expeditious review of criminal convictions should be the norm. Review must come quickly in order to relieve those in prison of the continuing effects of a wrongful conviction. A day in jail cannot be reclaimed. And if the error is one that can be repaired in a second trial, a prompt decision is essential so that this second trial will yield an accurate result. Memory and time pass together. This may harm the prosecutor in some cases, the defendant in others. In either case delay is the enemy of truth.

This case proceeded at a pace more usually associated with antitrust litigation than with the review of a criminal conviction. In November 1971 a Wisconsin court convicted Douglas Dean of killing his mother, his girlfriend's mother, and his girlfriend's three brothers. Dean received five consecutive terms of life imprisonment. In 1975 the Supreme Court of Wisconsin held that there had been several errors during the trial, all harmless. *State v. Dean*, 67 Wis.2d 513, 227 N.W.2d 712 (1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). In August 1977 the parties completed the briefing on Dean's petition for habeas corpus. Dean amended the petition in July 1980, and new briefs were filed in August. In June 1981 the district court granted the petition and issued a conditional writ, creating the prospect of a second trial more than a decade after the first.

In February 1982 the parties completed the briefing on the state's appeal, which was argued in April 1983. In September 1983 this court held in an unpublished order that because Dean had not exhausted all of the claims in his petition, he must return to the district court and start over. See *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Dean then deleted the unexhausted claims from his petition, and in November 1984 (only three months after the filing of the last significant paper) the district court reversed itself and denied the petition. Between June 1981 and November 1984, the court held, cases decided by the Supreme Court and this court had removed the basis of the earlier holding of constitutional error—a basis that itself had been created five years after Dean's trial. This case now has exceeded in duration the government's antitrust suits against both IBM and AT & T. We cannot bring it to an end today, although we trust that any further proceedings yet in store can occur before it exceeds the duration of certain litigation involving the Jarndyce family. Cf. *Lowe v. Duckworth*, 663 F.2d 42, 43 (7th Cir.1981); *Breazeale v. Bradley*, 582 F.2d 5, 6 (5th Cir.1978); *Dozie v. Cady*, 430 F.2d 637, 638 (7th Cir.1970).

I

The murders occurred during the evening of July 18, 1971, or the early hours of July 19. All five victims were killed by shots from Dean's rifle; several were murdered in their sleep. Dean turned up in an incoherent condition on the back step of a church at noon on July 19. He was taken to a hospital, where the physicians found some LSD in his pocket. His defense at trial was that he killed the people while under the influence of LSD and so lacked criminal intent. He said he had taken the LSD by accident. The state replied to this with the testimony of a psychiatrist that the effects of LSD last approximately eight hours, and that the duration of Dean's affliction in the hospital demonstrated that he had ingested the drug shortly before being discovered at the church. The prose-

cutor also offered evidence that Dean hated his mother and had told friends that he planned to come into money by killing her and his girlfriend's mother, that he told another inmate in jail that these were his first murders, and that he had expressed regret that he had to shoot his girlfriend's brothers more than once because they would not stop crying.

Dean's sister learned during the afternoon of July 19 that her mother was dead and Dean was in the hospital. She promptly called the family attorney and asked him to go to the hospital to represent Dean. The attorney told Dean not to talk to anyone. Dean followed this to the letter; he would not even talk to the physicians at the hospital except to give them a medical history. The prosecutor brought this out from four witnesses. He asked the examining physician what Dean had said; the physician replied that Dean said nothing, on advice of counsel. He asked the same questions of a detective and of Dean himself, getting the same answer. Then the prosecutor asked Dean's sister: "Why did you think he needed an attorney?" Dean's lawyer (not the family attorney) did not object to any of these questions.

The Supreme Court of Wisconsin found the questioning improper but harmless (227 N.W.2d at 723–24). It was improper because the retention of counsel did not impeach anything Dean said. It was harmless because "the sister's responses to this improper line of questioning sufficiently negated the inference that she asked the family attorney to go to her brother because she thought he had killed her mother" (*ibid.*) and because the "improper questioning of the defendant was mitigated by the fact that it was clear that he had not requested the attorney himself,—it was the family lawyer sent by his sister and he merely did what the attorney told him to do." *Id.* at 724.

The district court in 1981 agreed with the state court that the questioning was error. It relied on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which had been decided long after the trial in 1971 and a year after the state court's opinion.[1] *Doyle* holds that a prosecutor may not comment on a defendant's silence, at the time of arrest, after the defendant has received the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district judge thought *Doyle* equally applicable to this case, even though the silence in question preceded arrest and warnings. The judge also thought the questions impaired Dean's right to counsel under the sixth amendment, and he rejected the state court's conclusion that any error was harmless.

In 1984, however, the district judge took it all back. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), which the district court had overlooked in 1981, the Supreme Court held that a prosecutor may impeach a defendant with prior silence, if the silence preceded his arrest. Then in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Court held that impeachment from silence after arrest is permissible, provided the silence precedes the *Miranda* warnings. *Fletcher* treats *Doyle* as a prohibition of trickery by the government—the state may not first implicitly warn the defendant that silence will not be used against him and then accost him at trial once he remains silent. Here, the district court observed, the state had elicited Dean's silence before *Miranda* warnings, which under *Fletcher* it may do. As for the comment on the exercise of the sixth amendment right to counsel, the district court cited *Sulie v. Duckworth,* 689 F.2d 128 (7th Cir.1982), which held that the sixth amendment does not come into play until after a suspect is arrested or otherwise

**1.** The state has not argued that *Doyle* applies prospectively only. In *Phelps v. Duckworth,* 757 F.2d 811, 818–20 (7th Cir.1985), vacated en banc on other grounds, 772 F.2d 1410 (7th Cir.1985), a panel held that *Doyle* applies at least to cases pending on appeal when *Doyle* came down. The Supreme Court denied certiorari in Dean's case before it decided *Doyle.* Because the state has not argued the issue, we resolve the *Doyle* question without holding that *Doyle* applies retroactively.

becomes an "accused" within the meaning of that amendment. Dean was not an "accused" until he was arrested on July 22, and the court thought that was that.

 Dean now seeks to distinguish *Fletcher* on the ground that he had been advised by counsel to keep silent, while the suspect in *Fletcher* had not. The distinction will not wash. See *United States ex rel. Smith v. Rowe*, 746 F.2d 386 (7th Cir. 1984). Under *Jenkins* and *Fletcher*, the essential prohibition is against changing positions in midcase. The state may not advise the suspect that he has a right to remain silent and then turn about and use that silence against him. If the defendant selects silence for his own reasons, the state may refer to the silence without the vice of self-contradiction.

Although a state may not bushwhack a suspect who relies on the state's advice, it need not make a private lawyer's advice that silence is costless a self-fulfilling prophesy. *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed.2d 1054 (1926), illustrates the point. Raffle stood trial twice. At the first he did not testify; at the second he did; the prosecutor impeached his testimony at the second with his silence at the first. Raffel's decision to remain silent was more fully considered than Dean's, yet the Court held (and reiterated in *Fletcher*) it may legitimately be the basis of an inference. And although Dean presses on us the additional argument that he was dazed when he remained silent, this goes to the weight of the evidence rather than its admissibility. It may be, as Dean says, that his silence is perfectly consistent with innocence. That is an argument for the jury, not a constitutional objection to allowing the prosecutor to ask the question that will reveal whether the silence was indeed sufficiently inconsistent with the story at trial to be useful.

The prosecutor elicited not only Dean's silence but also his representation by counsel. *Sulie* disposes of the contention that any reference to counsel itself violates the sixth amendment. See also *Jacks v. Duckworth*, 651 F.2d 480, 482–83 (7th Cir.1981);

*United States v. Kopel*, 552 F.2d 1265, 1271–72 (7th Cir.1977). But it does not conclude the matter. A reference to a suspect's decision to retain counsel also draws into question rights secured by the due process clause of the fourteenth amendment. If the prosecutor had argued to the jury something along the lines of: "The defendant went right out and got a lawyer, so you can be sure he knew he was guilty", Dean would have a strong argument. (We need not decide if it would be powerful enough.) The transcript of the trial contains no such argument, however. In questioning Dean, his physician, and the detective, the prosecutor simply brought out the fact that Dean had counsel and dropped the matter. In context the reference to counsel helped Dean; it showed why he was silent and therefore blunted the prosecutor's effort to use silence as impeachment.

We do not have the transcript of the closing arguments, but Dean has not argued that the prosecutor made improper arguments then. Dean's counsel did not request at trial an instruction limiting the permissible inferences. At oral argument, counsel for Dean conceded that the prosecutor had never laid out for the jury the inference (if any) he sought to have it draw. There is therefore no basis for a conclusion that questioning of Dean and the physician violated the right to a fair trial secured by the due process clause. As the Supreme Court of Wisconsin pointed out, the reference to counsel could hardly have shown Dean's consciousness of guilt, because counsel had been sent by Dean's sister. And the inference would not in any event be a logical one for a juror to draw in the absence of an invitation by judge or prosecutor. "Certainly today, when the layman frequently views our criminal justice system as being confusing and complex, consultation with an attorney is not tantamount to an admission of involvement or guilt.... Because the average layman would recognize that a [suspect] ..., whether innocent or guilty, would seek the advice of an attorney ..., there is no sound basis for inferring that petit jurors would

view the use of professional assistance as an indication of criminality." *United States v. Kopel, supra,* 552 F.2d at 1271.

The question put to Dean's sister—"Why did you think he needed an attorney?"—presents a more difficult problem. This question invites the jury to infer that the sister's phone call to the family lawyer bears on Dean's guilt. The prosecutor maintained at oral argument that this is a legitimate inference. That the sister thought, as soon as she found out that her mother was dead, that Dean needed counsel, the prosecutor says, shows that she knew of Dean's hatred of their mother and his threats to kill her. *Sulie* held that retention of counsel sometimes is legitimately relevant to guilt or innocence. In *Sulie* the suspect's request for counsel tended to negate his claim that he was insane; the court observed that a request for a lawyer is the work of a sound mind. We need not determine whether the sister's request is similarly probative on the question whether there was friction within the Dean family. The Supreme Court of Wisconsin concluded that the sister's responses to the prosecutor's inquiry "negated the inference that she asked the family attorney to go to her brother because she thought he had killed her mother." 227 N.W.2d at 723–24. This finding of fact is entitled to deference under 28 U.S.C. § 2254(d) even though made by an appellate court. See *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). The prosecutor's question did not deprive Dean of a fair trial.

## II

Although this wraps up the discussion of the district court's 1984 opinion, its decision in 1981 rejected quite a few other challenges to the conviction. The only ones we need discuss are ineffective assistance of counsel and an instruction informing the jury that "[w]here there are no circum-

stances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts." This instruction, part of Wisconsin Jury Instruction 1100, was routinely given until 1979, when *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), held that a similar instruction unconstitutionally relieved the state of its burden of establishing every element of an offense beyond a reasonable doubt.

We held in *Pigee v. Israel,* 670 F.2d 690 (7th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982), that Instruction 1100 does not impermissibly assign a burden to the accused. Dean asks us to overrule *Pigee* in light of *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).[2] There is some question whether the issue is before us. The district court did not reach the question in 1981 in light of its decision to issue the writ on other grounds. In 1984 the district court again left the question unmentioned, this time apparently believing that Dean had dismissed it as an unexhausted claim. But we held in 1983 that Dean had exhausted his challenges to Instruction 1100. After our remand to allow Dean to purge his petition of unexhausted claims, he filed a motion to amend the petition by deleting challenges to "improper jury instructions given at trial which unconstitutionally shifted the burden of proof from the State to petitioner by requesting petitioner to prove his innocence...." Read in context, this motion deletes only a challenge to an instruction that "Defendant is now required to prove his innocence." The state says that "now" is just a typographical error for "not," and our prior decision held this issue not exhausted. The purpose of the motion to amend was to get rid of the unexhausted claims; there is no reason to think that Dean inadvertently expunged an

---

**2.** Once more, although *Francis* and *Sandstrom* are increasingly distant descendants of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), itself decided four years after Dean's trial, the state has not argued that

the cases are not retroactive. Once more, we therefore reach the merits. See *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 2912–13, 82 L.Ed. 2d 1 (1984) (Powell, J., concurring).

exhausted claim. And although the district court has never considered Dean's challenge to Instruction 1100, there would be no point in remanding the case to obtain the district court's opinion whether this court should overrule *Pigee.* We must settle that issue ourselves.

■ *Pigee* held that Instruction 1100 did not improperly shift the burden for four reasons (670 F.2d at 694–95): (1) the presumption could be overcome by "circumstances to prevent or rebut" it, while the instruction held invalid in *Sandstrom* had no similar qualifying language; (2) the instruction refers to the consequences of a "deliberate" act, not (as in *Sandstrom*) a "voluntary" one; the court thought this required the state to show an elevated level of consciousness to bring the presumption into play; (3) the instruction refers to the intent of a "reasonable" person, not (as in *Sandstrom*) "any person;" again the court thought this put a burden on the state to bring the presumption to bear; (4) the presumption is dispelled by *any* evidence (the import of the *"no* circumstances" language), and such a bursting-bubble instruction is the equivalent of the permissive inference sustained in *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). We add: (5) the instruction refers to "circumstances" but does not say who has the burden of making these "circumstances" appear, and it is therefore not necessarily read as throwing a burden on the defendant.

There was a strong dissent in *Pigee* (670 F.2d at 697–99 (Baker, J.)), and the Supreme Court's cases do not announce a firm principle that vindicates the majority's decision in *Pigee. Francis* pulls the rug out from under the first reason the majority gave in *Pigee;* the Court held unconstitutional in *Francis* an instruction that informed the jury that "the presumption [of intent] may be rebutted." But *Francis* is also a narrowly drawn decision. It requires analysis of the "specific language" of the instruction "in the context of the charge as a whole." 105 S.Ct. at 1971. The opinion therefore does not discard the other four distinctions between Instruction 1100 and the instruction held invalid by *Sandstrom.*

The Court continues to review similar instructions. See *Rose v. Clark, cert. granted,* —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985). The Wisconsin instruction may or may not receive the approbation of the Supreme Court; certainly it presses if it does not exceed the wavering boundary staked out in the Court's cases. It would ill serve litigants' (and judges') legitimate interest in the stability of our precedents, however, were we to revisit a decision as recent as *Pigee,* most of the reasoning of which is as strong now as it was then. We therefore decline to overrule *Pigee.*

Instruction 1100 did not improperly shift the burden to Dean. Indeed, if the jury believed even a tiny bit of his defense the instruction would have carried no weight. Dean's evidence portrays him as under the influence of LSD, so that he committed no "deliberate" acts and was not at all "reasonable." There would have been no presumption under the instruction, and there were plenty of "circumstances" that—if the jury believed Dean's story—burst the bubble. If the jury did not believe Dean's story, then he had no defense and again Instruction 1100 played no role in this trial.

■ This leaves only the attack on the adequacy of counsel. In 1981 the district court rejected this contention, and we concur. Counsel presented the only defense Dean might have had. Dean does not say that counsel's investigation was inadequate, that he overlooked a useful defense or failed to present material evidence. To the contrary, counsel showed enterprise in dealing with a thorny problem. The five murders attracted substantial public notice, and Dean says that counsel was ineffective because he did not seek a change of venue. But counsel instead obtained an order closing the preliminary examination to the public and kept almost all of the gory details out of the hands of the press until after the jury had been selected. The Supreme Court of Wisconsin held that the resulting

efforts to select an unbiased jury were adequate (227 N.W.2d at 718–19).

Dean's principal complaint about the representation is that counsel did not object enough to the prosecutor's questions. He did not object, for example, to the prosecutor's questions about Dean's silence in the hospital. But the trial took place five years before *Doyle*, and it is hard to fault counsel for not objecting to questions that—several turns in the law now reveal—were not objectionable. On other fronts, counsel objected (albeit without success) to some hearsay evidence that the state court found improperly admitted (*id.* at 721). Although counsel failed to object to some other evidence, the state court held its admission harmless. This ruling was almost inevitable in light of the fact that the controlling issue in the trial was whether the jury believed that Dean was under the influence of LSD at the time of the murders or instead had taken the drug afterward. Counsel need not be perfect, indeed not even very good, to be constitutionally adequate. Dean's counsel met the minimum constitutional standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

As we have observed several times, Dean still has some unexhausted claims. Perhaps we will see him again one day. But see *Rose, supra*, 455 U.S. at 520–21, 102 S.Ct. at 1204 (plurality opinion). We have disposed of the principal arguments, however, and the judgment of the district court is

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment and the opinion of the court. However, two of the issues addressed by the court are particularly troublesome, and I write to emphasize why I believe that the court's disposition of them is a principled one.

The first issue relates to the prosecutor's questioning of Dean's sister regarding her retention of an attorney to represent her brother. The prosecutor suggested that it was permissible for the jury to infer that she had retained a lawyer for her brother because she thought he had committed the murders then under investigation. The court relies on the statement of the Wisconsin Supreme Court that the sister's answers to the prosecutor's suggestion negated any inference that her action was based on a belief in her brother's guilt. This statement, holds the court, is a finding of fact which we are obliged to accept under the holding of the Supreme Court in *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

The line between findings of fact (which we must accept under the mandate of section 2254(d)) and conclusions of law regarding the significance of those facts as tested against a federal constitutional standard (which is clearly the responsibility of the federal court) is, as the Supreme Court has admitted, not always an easy task. *See Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985); *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984). The available precedents from the Supreme Court and from this court do not yet present us with a principled distinction capable of easy application to every case. Indeed, absent further guidance—judicial or legislative—the lower federal courts are in danger of developing a caselaw reflecting distinctions more compatible with metaphysics than criminal procedure. Until we receive the necessary guidance, lower federal courts should, in my view, break as little new ground as possible and be especially sensitive to the directions set by the Supreme Court in this delicate allocation of power between federal and state judiciaries in the criminal procedure area. This case does not, however, require that we break any new ground. The existing Supreme Court precedent makes clear that the Supreme Court of Wisconsin's determination that the prosecutor's inference had been effectively neutralized by Dean's sister's later explanation is worthy of deference by the federal courts. *See Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Witt*, 105 S.Ct.

at 853–55; *Patton,* 104 S.Ct. at 2891–92; *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).

While the Wisconsin Supreme Court did not set forth the grounds for its determination, the record does affirmatively demonstrate a solid foundation for such a conclusion. Immediately after responding to the prosecutor's question, the sister, in response to a question posed by Dean's counsel, explained that her decision to get a lawyer for her brother was based on a prior discussion with her father about the necessity of consulting with counsel early when a family member was involved in a criminal investigation:

Q: Mrs. Schneider, have you had occasion to see Douglas examined by the police before.

A: I had not observed it but when my father and I had been discussing what happened to Debbie Westenberger one time he said "the greatest mistake I ever made was in allowing a detective to take Douglas away without calling a lawyer first." That's why I called an attorney on this case. I knew what happened when he didn't have an attorney present.

Trial Tr. at 840.

The second issue relates to the court's holding that the instruction given in this case is sufficiently different from that at issue in *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). I concur fully in that view. While the court quite frankly admits that the lower courts have yet to receive complete guidance on the scope of *Francis,* its rationale for not applying its holding in this case is a principled one. Reversal on the authority of *Francis* would be particularly inappropriate in this case in light of Dean's defense that he was under the influence of LSD at the time of the alleged offenses.

Under the defense theory, Dean would have committed no deliberate act which would have triggered the application of the instruction.

Accordingly, I join the judgment and the opinion of the court.