**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James William LEWIS,
Defendant-Appellant.**

**No. 84–2011.**

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1985.

Decided July 18, 1986.

Donald V. Morano, Chicago, Ill., for defendant-appellant.

Ruben Costillo, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL, Senior District Judge.*

ESCHBACH, Circuit Judge.

The primary questions presented in this appeal from the defendant's conviction for attempted extortion under 18 U.S.C. § 1951 are whether (1) the evidence was insufficient to support the verdict, (2) the jury instructions regarding intent were improper, (3) venue was improper, (4) the district court erred in admitting evidence of the defendant's flight, and (5) comments made by the prosecution in closing argument were unduly prejudicial. For the reasons stated below, we will affirm the judgment of conviction.

I

The defendant, James W. Lewis, and his wife, LeAnn Lewis, lived for several years in Kansas City, Missouri. During the late 1960s, the defendant was a student at the University of Missouri. During the 1970s, he was self-employed as a "tax preparer." A search of the defendant's former residence in Kansas City revealed that he had two "form extortion" letters in his possession in the latter part of 1981.[1] There was

---

* The Honorable William J. Campbell, Senior District Judge, for the Northern District of Illinois, sitting by designation.

1. The first document read:

I have a list of your major loans both chattel, UCC, and real estate as filed with the county. I also have a partial list of your major depositors obtained from transit lists and DIM lists.

If you would like to prevent me from contacting each of these people and insulting them in your bank's name or having my computer to send these customers letters on your company letterhead, then do the following. Begin immediately to send $5,000 on the 10th day of each month by wire to Bank Account No. _____, Bank ABA No. _____. This account number and bank will change from time to time on instructions from me. It will be easy for you to effect the identification of the courier, but it will also be futile. I shall simply install another courier.

I will also escalate the amount of damage you and your institution will receive. Obviously, it is not to my advantage to have you suffer needlessly. Couriers do not know my identification and like you, none of them have ever met me. Each has been compromised in a very individual way. Although each courier could stand to lose much that is to them very important, none has sizable assets for you to obtain through a judicial attachment.

no evidence presented at trial, however, that the defendant sent these documents to anyone.

In December of 1981, the defendant and his wife moved to Chicago, where they assumed the names Robert and Nancy Richardson. On approximately January 20, 1982, the defendant started work at Chicago Tax Service preparing tax returns. In March of 1982, he worked for one week as a word-processor operator at the A.G. Becker Investment Company. He also worked as a temporary employee at the First National Bank of Chicago ("First National") from April to August of 1982, where he primarily performed secretarial services. The computer system to which he had access contained information about corporate accounts. The defendant was assigned to several sections of First National, including its worldwide banking system, the international financial institution section, and the retailing companies division.

In January of 1982, the defendant's wife assumed employment in Chicago at Lakeside Travel ("Lakeside"), which was owned and operated by Frederick McCahey. She worked as a bookkeeper under the supervision of Barbara Vaitkus. In early 1982, Lakeside was in serious financial trouble, and ceased doing business on or about April 23 of that year. On that date, Vaitkus prepared approximately 18 employee payroll checks for a total of about $8,000. These checks were rejected for insufficient funds when presented for payment. The defendant's wife had cashed her Lakeside payroll check in the amount of $512 at a currency exchange. When the check was returned, the exchange filed suit against her in the latter part of July 1982. She subsequently agreed to provide reimbursement and paid either $50 or $100. The defendant was extremely upset that his wife was required to make repayment. Other Lakeside employees were also sued by currency exchanges and most made good on the dishonored checks.

A majority of the Lakeside employees filed claims with the Wage Claim Division of the Illinois Department of Labor in an attempt to collect on the dishonored checks. Vaitkus apparently told the defendant, who was seeking information about the affairs

---

Furthermore, without knowledge of the fee simple title owners, several deeds of trusts and equivalent mortgage instruments have been recorded at courthouses in this and other states. You and other members of your family and business colleagues have been named grantees of record. Where necessary the trustee is also named from the same small group of people. As you know, very little real estate is being sold due to the condition of the economy, but just in case I have taken the precaution of having the fictitious guarantees establish mailing addresses at several locations in the country. If a sale is contemplated, an abstractor or title company will routinely notify the seller of the existence of the outstanding DT and note, et cetera. The seller or his representative will then contact the mailing address and the grantee, you and your friends, will quickly and quietly release the encumbrance.

However, as a last resort you shall be identified on one or more of the instruments to the owner and the proper authorities. Needless to say, respectable, competent witnesses plus corpus delecti will exist in each of the several instances of disclosure.

The second read:

As you can easily see, you stand to lose (a) large amounts of deposits; (b) face embarrassment of indictment and probable conviction for real estate fraud, mail fraud, et cetera; (c) personal bankruptcy; (d) permanent exclusion from the banking business and other positions of trust; and (e) loss of friends and family respect. As you can easily understand, The Justice Department is not likely to be able to assist you. Make inquiries if you like, but for your own sake please be discreet. The things I have described are already in place and too much looking could cause you delay.

Remember, time is of the essence. Do as you are told and you will be protected. After all, I have already invested much time and money to prepare your case file and I like to protect my investments just like a banker. I also bank with my friends. Cooperate and your bank and you shall proper [sic].

Forensics.

A. This message is a copy. Only originals can be examined and admitted as evidence. This covers such matters as the type or model of typewriter, the type of ribbon and characteristics or imperfections in the typewriter.

B. Fingerprints. I have handled the stamp, paper and envelope only with gloves.

C. Stamp. Licking the stamp could leave evidence of blood type. I used a wet sponge.

of Lakeside, that McCahey was diverting company funds to pay personal bills and was not properly depositing receipts. She also gave the defendant one of McCahey's account numbers, 8449597, at the Continental Illinois National Bank & Trust Company of Chicago ("Continental").

On August 3, 1982, several former Lakeside employees, including the defendant's wife, attended a wage-claim hearing. The defendant was also present. McCahey had not yet arrived when the hearing started. The hearing officer and McCahey's attorney explained that there were no funds in the Lakeside accounts to satisfy the payroll claims. The defendant argued that McCahey's personal accounts should be made available, to which McCahey's attorney countered that these accounts were either frozen or closed. The hearing officer ultimately concluded that he could provide no recovery for the former Lakeside employees and that their only recourse was to file a court action. After McCahey's attorney left the hearing, McCahey himself arrived. An argument then developed between the defendant and McCahey, and the latter apparently threatened the defendant's wife.

On or about September 3, 1982, the defendant and his wife, traveling under the names of William and Karen Wagner, took a train from Chicago to New York City and moved into a low-rent hotel upon their arrival. The defendant's wife, using the name Nancy Richardson, secured temporary employment at a firm in Manhattan and worked there from September 20, 1982, to October 14, 1982. On Friday, October 15, 1982, the defendant's wife phoned in sick. The defendant also called the firm the following Monday and said that his wife had a tumor on her kidney. Mrs. Lewis never returned to work at the firm or to pick up her paycheck. The defendant and his wife also left their hotel before their weekly rental period had expired and checked into another low-rent hotel in New York on October 18, 1982, under the names of Edward and Carol Scott. From November 26 to December 13, 1982, the defendant's wife, using the name of Scott, worked as a bookkeeper in another Manhattan business.

On September 29, 1982, seven persons died in Chicago, Illinois, due to the ingestion of cyanide that had been placed in Tylenol capsules. Tylenol is manufactured by McNeil Pharmaceutical Corporation, a wholly owned subsidiary of Johnson & Johnson, which has its corporate headquarters in New Brunswick, New Jersey. The product is sold in all fifty states and, prior to the poisonings, was a top-selling pain reliever. Its gross sales in Illinois alone in 1982 were in excess of $10 million. An extensive investigation headed by federal, state, and local authorities began in response to the poisonings. Three more bottles with contaminated capsules were found. It was determined that the cyanide used was relatively inexpensive, ranging in cost from $7 to $11 per pound.

In response to the poisoning crisis, Johnson & Johnson assembled a number of executives, including the company's top management, into a group known as the Tylenol Strategy Committee ("Committee"). The Committee decided to remove Tylenol capsules from the market, to discontinue all advertising of the product, and to halt its manufacture until tamper-resistant packaging could be developed. In an effort to discover the source of the contamination, Johnson & Johnson checked the contents of over 10 million Tylenol capsules.

As of October 6, 1982, the company did not know how the cyanide had been introduced into the capsules. On that day, the director of security of Johnson & Johnson distributed to the Committee a handwritten letter addressed to Johnson & Johnson, which read as follows:

> Gentlemen: As you can see, it is easy to place cyanide, both potassium and sodium, into capsules sitting on store shelves. And since the cyanide is inside the gelatin, it is easy to get buyers to swallow the bitter pill. Another beauty is that cyanide operates quickly. It takes so very little. And there will be no time to take countermeasures.

If you don't mind the publicity of these little capsules, then do nothing. So far I have spent less than $50 and it takes me less than 10 minutes per bottle.

If you want to stop the killing, then wire $1 million to bank account number 8449597 at Continental Illinois Bank, Chicago, Illinois.

Don't attempt to involve the FBI or local Chicago authorities with this letter. A couple of phone calls by me will undo anything you can possibly do.

The Committee was concerned that the letter was authentic, that it had been written by the person who had initially placed the cyanide in the Tylenol capsules, and that he stood ready to do it again, unless his demands were met. Johnson & Johnson was prepared to transfer the $1 million demanded to Continental, but the FBI instructed it not to do so. The money most likely would have been wired from the Chase Manhattan Bank in New York. Continental would have accepted the transfer, even if the account number had no longer been valid, and such a transfer would have made the funds immediately available to Continental for general banking use. Continental would have attempted to verify the accuracy of the transfer and, if necessary, would have returned the money to the Chase Manhattan Bank. Continental also would have accepted the transfer in an effort to cooperate with the investigating authorities.

The law-enforcement task force determined that the account number 8449597 had been assigned to McCahey and had been open from August 24, 1981, to May 10, 1982. The postage on the envelope of the demand letter had come from Lakeside's postage machine and was marked with the identification number of that device. The task force determined, however, that the letter had been written by the defendant. On October 13, 1982, a complaint charging Robert Richardson with attempted extortion and a warrant for his arrest were issued.

It was shortly after the charge, the warrant, and a photograph of Lewis had been made public in October of 1982 that the defendant and his wife, under the last name of Scott, moved to another low-rent hotel in New York City. As a result of a massive manhunt, the defendant was arrested on December 13, 1982, at a New York City public library. When he was apprehended, the defendant was reading two reference books: "Newspapers of the Southwest" and "Largest Corporations in America." It was determined after the arrest that the defendant's true name was James Lewis.

Evidence was introduced at trial that the defendant had sent letters to the Chicago Tribune, the Department of Justice, and the FBI after the warrant had been issued, but prior to his arrest. The defendant included his thumbprint, photograph, and drivers license with the letters, which he signed James William Lewis. By way of these exhibits, the defendant attempted to prove that he had sent a packet of documents in early August of 1982, to the Illinois Attorney General's Office and to the United States Attorney's Office in Chicago regarding the alleged fraud committed by Lakeside. The government introduced testimony, however, that neither the Illinois Attorney General's Office nor the United States Attorney's Office received a complaint from the defendant about Lakeside or McCahey in August of 1982.

The defendant was tried in Chicago on a one-count indictment for attempted extortion in violation of 18 U.S.C. § 1951. After a six-day jury trial, he was convicted and was sentenced on June 14, 1984, to ten-years imprisonment.[2] He now appeals.

## II

### A. Sufficiency of the Evidence Regarding Intent

Lewis does not deny that he wrote and mailed the letter in question. He does argue, however, that the evidence presented by the government at trial fails to show

---

**2.** This sentence is to run consecutively to the ten-year sentence for mail fraud imposed by

Judge Roberts of the Western District of Missouri on July 12, 1983, and June 5, 1984.

that he had the requisite intent to support a conviction of attempted extortion under 18 U.S.C. § 1951. He claims that, because it was virtually impossible for him to obtain any funds by means of the letter (because, for example, the account was closed, assigned to another individual, and would be monitored by the authorities) and because he was aware of this "impossibility," his conviction must be overturned. He asserts that the evidence shows only that his intent was "not to extort money but to cause grief to [McCahey], to blow the whistle on him, and to spur a thorough and exhaustive investigation of his finances and fraudulent business dealings" (Appellant's Brief at 13). However, even if we accept Lewis's claim that his primary reason for mailing the letter was to "expose" McCahey, the conviction must stand.

18 U.S.C. § 1951(a), commonly known as the Hobbs Act, provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

■■■ The defendant couches his argument in terms of impossibility, but it is in fact nothing more than an attack on the sufficiency of the government's proof on the issue of intent. On appeal, of course, we must review all the evidence, and all reasonable inferences that can be drawn from the evidence, in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *See United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985). To secure a conviction under the Hobbs Act, the prosecution does not have to show that the defendant acted to receive, either directly or indirectly, the proceeds of his extortion or any benefit therefrom. *See United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 563 (1984); *United States v. Rindone*, 631 F.2d 491, 493 (7th Cir.1980); *United States v. Frazier*, 560 F.2d 884, 887 (8th Cir.1977), *cert. denied*, 435 U.S. 968 (1978); *United States v. Jacobs*, 451 F.2d 530, 535 (5th Cir.1971), *cert. denied*, 405 U.S. 955 (1972). Loss to the victim is the gravamen of the offense. *Frazier*, 560 F.2d at 887; *United States v. Lance*, 536 F.2d 1065, 1068 (5th Cir.1976); *United States v. Hyde*, 448 F.2d 815, 843 (5th Cir.1971), *cert. denied*, 404 U.S. 1058 (1972). Indeed, the "property" of which the victim is deprived need not be tangible, but may be no more than the right to make his business decisions free of threats and coercion, or other intangible rights. *See United States v. Hoelker*, 765 F.2d 1422, 1425 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1219 (1986); *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 450 U.S. 985 & 452 U.S. 905 (1981); *United States v. Santoni*, 585 F.2d 667, 672–73 (4th Cir. 1978), *cert. denied*, 440 U.S. 910 (1979); *United States v. Nadaline*, 471 F.2d 340, 344 (5th Cir.), *cert. denied*, 411 U.S. 951 (1973); *United States v. Tropiano*, 418 F.2d 1069, 1075–76 (2d Cir.1969), *cert. denied*, 397 U.S. 1021 (1970). The extortionist, therefore, does not have to intend to receive the funds demanded. Thus, the defendant would have violated § 1951 if, for example, he had simply demanded that Johnson & Johnson burn $1 million in cash.[3]

---

**3.** Of course, a showing by the defendant that the extortion scheme would in no way advance his self-interest would undercut the conclusion that he had the intent to extort. Most extortionists undoubtedly seek a direct and tangible economic benefit from their demands. Others do not, however, because they may be motivated only by a desire to humiliate the victim or a third party, and the discomfort they cause is the gain they derive from the scheme. Nonetheless, the Hobbs Act prohibits certain interferences with interstate commerce, and an extortion demand may have the proscribed deleterious effect on such commerce, even though the defendant never receives a transfer of property from the victim.

The jury considered, and rejected, the defendant's theory that he lacked the requisite intent. That decision is completely consistent with the evidence adduced below. The defendant confuses the concepts of motive and intent. That the defendant's end may have been to expose and humiliate someone he considered dishonest does not render acceptable the means he might choose to accomplish that goal. One might, for example, reasonably believe that one's government is engaged in widespread violations of the law; that belief, however, will not exculpate someone charged with kidnapping after abducting a high official in order to focus public attention on the government's actions and policies. A desire to expose government wrongdoing is in no way inconsistent with forming the intent to kidnap. Similarly, the defendant's letter to Johnson & Johnson is no less incriminating, even though that corporation may have been no more than the unfortunate pawn in Lewis's plan to expose his wife's former employer.[4]

■ Intent is rarely proved by direct evidence, and the question under the facts of this case is whether the record supports the jury's conclusion that Lewis intended for Johnson & Johnson to part with property. It would be difficult to conclude that he did not. The evidence is unclear about the defendant's understanding of the status of McCahey's account, but even if it were clear that he thought the account was closed, the result would be the same. Lewis was familiar with the procedure for wire transfers between banks. The Tylenol crisis demanded immediate action from Johnson & Johnson. The evidence shows that the company stood ready to transfer the money, but that the FBI instructed it not to do so. The evidence strongly suggests that Johnson & Johnson's probable response would be to wire the funds and it is completely consistent with Lewis's professed motive of exposing McCahey that he expected the corporation to part with the money. Even a temporary loss of the use of money constitutes a deprivation of property under § 1951. *United States v. Lance,* 536 F.2d 1065, 1068 (5th Cir.1976). The defendant has done no more than suggest different interpretations for his actions. The verdict of conviction, however, is supported by the evidence, and the defendant has presented this court with no persuasive reason to doubt that it is the correct one.

### B. Jury Instructions

■ Lewis challenges a jury instruction given below regarding the issue of intent. That instruction provided:

> In determining the defendant's intent, you are hereby instructed that the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts, unless you find from the evidence in this case that there are facts or circumstances that prevent or rebut this presumption.

Relying on *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965 (1985), Lewis argues that this instruction created a mandatory, although rebuttable, presumption, that had the effect of unconstitutionally shifting the burden of persuasion regarding an essential element of the offense, *i.e.,* intent, to the defendant. We disagree.[5]

---

Without knowing the defendant's feelings about McCahey, one might be hard pressed to explain why Lewis would have intended for Johnson & Johnson to part with property. However, the dispute with McCahey provides the missing link: Lewis sought to expose McCahey by capitalizing on the Tylenol poisonings and by forcing Johnson & Johnson to transfer money in order to undo his nemesis. What the defendant sought to gain was the personal satisfaction of witnessing the ruination of his wife's former employer. Thus, he was acting to advance his self-interest, even if he knew he would not receive any funds from Johnson & Johnson.

4. We note that the "form extortion" letters found in the defendant's former Kansas City residence severely undercut his contention about the beneficence of his motive.

5. The parties have not addressed the question of the retroactive application of *Francis.* We will assume, without deciding, that *Francis* applies to this case. *See Dean v. Young,* 777 F.2d 1239 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106

In *Dean v. Young,* 777 F.2d 1239 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1794 (1986), this court had occasion to consider whether the following intent instruction was consistent with *Francis:*

> Where there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts.

This court found that the instruction was not constitutionally infirm. The instruction in the instant case, redacted to eliminate surplusage, reads:

> The law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts, unless there are facts or circumstances that prevent or rebut this presumption.

The only distinction between the instruction at issue in the instant case and that in *Dean* is the qualifying phrase (which here appears at the end of the sentence, while it appeared at the beginning in *Dean).* The tone of the instruction given in this case seems more favorable to the defendant than that in *Dean.* Nonetheless, in regard to the effect on the burden of proof, there is absolutely no meaningful substantive distinction between the two instructions.[6] Thus, as in *Dean,* 777 F.2d at 1244, the instruction is proper under *Francis.*

We have also considered the other objections Lewis raises to the instructions given below and have found them to be without merit.

## C. Venue

Prior to trial, Lewis filed a motion to dismiss for lack of proper venue, which was denied by the district court. He now maintains on appeal that the crime of attempted extortion was completed outside the Northern District of Illinois, so that his conviction in that district violated Article III, § 2, cl. 3, and the Sixth Amendment of the Constitution, as well as Fed.R.Crim.P. 18, and must be reversed.[7] We do not agree.

▮▮▮ The defendant's argument represents a misapprehension of the scope of the Hobbs Act. The constitutional requirements for venue depend on the locality of the offense, not the personal presence of the offender, and the *locus delicti* is determined from the nature of the crime alleged and the location of the act or acts constituting it. *Travis v. United States,* 364 U.S. 631, 634–35, 81 S.Ct. 358, 360–61 (1961). The facts establishing venue need be proved only by a preponderance of the evidence and may be established by circumstantial evidence. *United States v. Rodgers,* 755 F.2d 533, 549 n. 19 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3532 (1985); *United States v. Winship,* 724 F.2d 1116, 1124 (5th Cir.1984); *United States v. Powell,* 498 F.2d 890, 891 (9th Cir.), *cert. denied,* 419 U.S. 866 (1974). Section 1951 proscribes acts that "in any way or degree obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce" (emphasis added). This language indicates that "the purpose of the Hobbs Act parallels the central purpose of the Commerce Clause itself" and is an ex-

---

S.Ct. 1794 (1986); *see also Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065 (1985).

**6.** It is true that the quantum of "facts or circumstances" necessary to overcome the "presumption" was not explicitly stated in Lewis's case. The obvious implication, however, where there is no quantification, is that anything more than the complete absence of such "facts or circumstances" is enough to "rebut," so that, given its plain meaning, the qualifying phrase in the instant case is logically equivalent to that in *Dean.*

**7.** Article III, § 2, cl. 3, provides that criminal trials "shall be held in the State where the ...

Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Sixth Amendment (technically a vicinage provision) provides that a criminal trial shall be conducted in "the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Rule 18 provides that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."

pression of Congress's intent to exercise its full power under the Clause to secure freedom of trade and to punish (either actual or attempted) interference with interstate commerce by extortion, robbery, or physical violence. *United States v. Staszcuk,* 517 F.2d 53, 58 (7th Cir.) (en banc) (citing *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272 (1960)), *cert. denied,* 423 U.S. 837 (1975). Thus, the effect on commerce needed to support venue in a Hobbs Act case goes to the very limits of the power of the federal authorities to regulate such activities. This court, therefore, has long held that venue for a Hobbs Act prosecution lies in any district where the requisite effect on commerce is present, even if the acts of extortion occur outside the jurisdiction. *See United States v. Craig,* 573 F.2d 513, 517 (7th Cir.), *cert. denied,* 439 U.S. 820 (1978); *United States v. Floyd,* 228 F.2d 913, 916–19 (7th Cir.) (venue under Hobbs Act "properly laid either in the jurisdiction wherein the coercion is perpetrated or in that wherein commerce is affected thereby"), *cert. denied,* 351 U.S. 938 (1956); *accord United States v. Reed,* 773 F.2d 477, 482 (2d Cir.1985); *United States v. Billups,* 692 F.2d 320, 332–33 (4th Cir.1982), *cert. denied,* 464 U.S. 820 (1983); *United States v. O'Donnell,* 510 F.2d 1190, 1193 (6th Cir.), *cert. denied,* 421 U.S. 1001 (1975); *cf.* 18 U.S.C. § 3237.

The question then is what effect on interstate commerce in the Northern District of Illinois did the government demonstrate at trial. The prosecution is not required to prove that the defendant had the specific intent to affect interstate commerce, *Staszcuk,* 517 F.2d at 59,[8] or that there was an actual effect on commerce. Indeed, all the government's evidence must show is a realistic probability that, after the demand for payment was made (that is, the effect need not be simultaneous with the attempted extortion), there would be a *de minimus* effect on interstate commerce. *See United States v. Mattson,* 671 F.2d 1020, 1023–24 (7th Cir. 1982); *United States v. Rindone,* 631 F.2d 491, 492–94 (7th Cir.1980); *United States v. Hedman,* 630 F.2d 1184, 1193, 1195–96 (7th Cir.1980), *cert. denied,* 450 U.S. 965 (1981); *United States v. Blakey,* 607 F.2d 779, 783–84 (7th Cir.1979); *Staszcuk,* 517 F.2d at 60. This is true even if law-enforcement authorities provide the money with which the defendant is paid, or if the defendant makes an implied, although unrealizable, threat to affect the future business operations of the victim. *Rindone,* 631 F.2d at 492–94. By the same token, even though the crime of attempted extortion is completed with the demand for payment, *id.* at 493, the prosecution for that crime may be held in any district where there is a realistic probability of the required effect on interstate commerce. *Id.* at 493–94.[9]

The evidence, when viewed in the light most favorable to the government, shows without question that, when Lewis made the payment demand, there was a realistic probability of the required effect

8. As Judge (now Justice) Stevens noted in *United States v. Staszcuk,* 517 F.2d 53 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837 (1975), the prosecutor does not have to prove that the defendant had an "anti-federal scienter." *Id.* at 59 (citing *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255 (1975)).

9. In its one-page response to Lewis's venue challenge, the United States does not explicitly argue in its brief to this court that the prosecution could be conducted in Chicago under a "depletion of assets" theory. *See generally United States v. Mattson,* 671 F.2d 1020, 1023–24 (7th Cir.1982). Under the facts of this case, the "depletion" theory could mean that venue was proper in every district where Johnson & Johnson did business. If the government had elected to prosecute Lewis in, for example, Alaska, a different set of considerations would come into play. However, because the government does not press the "depletion" argument, we will not consider it and it forms no basis for our decision. *See United States v. Staszcuk,* 517 F.2d 53, 57 n. 10 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837 (1975). Suffice it to say that there was a realistic probability of much more than a *de minimus* effect on interstate commerce in the Northern District of Illinois. We also note that Lewis is only arguing that the crime with which he was charged was completed outside the Northern District, not that prosecution in that district was inconvenient for him or the witnesses.

on interstate commerce in the Northern District of Illinois either before or after the demand. An actual effect was shown, for example, by the fact that the letter to Johnson & Johnson was stamped by Lakeside's postage meter in Chicago. We need not rely on this, however, because it is self-evident that, if any money had been wired to Continental from outside of Illinois, venue was proper in the Northern District, and that the evidence shows that there was at the very least a "realistic possibility" that such a payment would have been made. Even if this were not so, however, it is clear under the evidence that Johnson & Johnson and Continental, in response to the inquiries about the letter that arrived in New Jersey, would both have to alter their business operations in the Northern District of Illinois and to expend resources there as a direct result of the threat. *See Rindone*, 631 F.2d at 493–94; *Staszcuk*, 517 F.2d at 60. We conclude, therefore, that it was constitutionally proper to bring Lewis to trial in that district.

### D. Evidence of Flight

After the warrant for Lewis's arrest was made public, he and his wife moved to a different hotel in New York City and assumed yet another alias. The defendant admits that he did not turn himself into the authorities and that moving to another hotel was a part of his attempt to avoid detection. Counsel for Lewis filed a motion *in limine* to preclude the introduction of any evidence regarding the Lewis's flight. This motion was denied by the trial judge, and the prosecution was allowed to present evidence regarding the defendant's actions after the warrant had been issued. The district court instructed the jury that "an intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of the crime, is a fact which, if proved to your satisfaction, may be considered by the jury in the light of all the other evidence in the case determining guilty or innocence." The defendant argues on appeal that this evidence was irrelevant and highly prejudicial, so that the trial court's refusal to exclude it constitutes error entitling him to a new trial. We disagree.

Evidence of a defendant's flight and concealment is admissible as evidence of consciousness of guilt, and thus of guilt itself. *See United States v. Zabic*, 745 F.2d 464, 471 (7th Cir.1984); *United States v. Solomon*, 688 F.2d 1171, 1176 (7th Cir. 1982); *United States v. Jackson*, 572 F.2d 636, 639 (7th Cir.1978); *United States v. cert. denied*, 439 U.S. 847 (1978). It, however, constitutes an admission by conduct and may, therefore, be susceptible to conflicting interpretations. The probative value of this circumstantial evidence "depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to the consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged to actual guilt of the crime charged." *Jackson*, 572 F.2d at 639. On the record of this case, the evidentiary support for this chain of inferences is overwhelming. Lewis offers several "thought experiments" in his arguments to this court in an attempt to demonstrate "phenomenologically" that the flight evidence was irrelevant (Appellant's Brief at 38). However, notwithstanding the interesting presentation, the defendant has done no more than suggest alternative characterizations of the evidence. That other interpretations are conceivable, so that flight is not conclusive on the question of guilt, does not mean that the evidence is irrelevant. Lewis's argument goes too far, as it would foreclose the admission of this type of evidence in any prosecution.

The government's position concerning this evidence was a reasonable one, and the jury was allowed to chose between the defendant's and the prosecution's version of the facts. Not only do we find that the evidence was relevant, but we also see no support in this record for the defendant's contention that the testimony was unduly prejudicial. In addition, the trial court ade-

quately instructed the jury about the use of this evidence, and corrected any errors that arose in its presentation.[10]

### E. Closing Arguments

■■ Lewis asserts that he was denied a fair trial, because of certain statements made by the prosecutor in the closing arguments. After thoroughly reviewing the record, we find that the United States Attorney did at times stray beyond the permissible bounds of vigorous advocacy, but we also find that the defendant was not unduly prejudiced thereby.

For the purposes of this appeal, the remarks to which the defendant now takes exception must be divided into two groups: those to which he presented a contemporaneous objection and those to which he did not. For the first group, we must determine whether those remarks were so prejudicial as to deprive the defendant of a fair trial. *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 448 (1984). For the second, we must apply the "plain error" exception to the contemporaneous-objection rule, an exception that must be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, ——, 105 S.Ct. 1038, 1047 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14 (1982)). We also note that the trial judge repeatedly informed the jury that arguments of counsel were not evidence, and that many of the passages to which Lewis directs our attention merit no further discussion, because they were, if improper at all, harmless beyond a reasonable doubt.

■■ Lewis argues that the prosecutor deliberately conflated the law of intent with that of attempt in his closing statements to the jury. As the discussion in Section II(A) indicates, the two concepts were linked together on the facts of this case, because Lewis maintained that, since

he allegedly knew he could not obtain the money, he did not have an intent to extort and, therefore, was not guilty of attempt. In any event, most of the prosecutor's statements were not objectionable, and when they were, the trial judge intervened quickly in response to the defendant's objections and told the jury that the forthcoming instructions would provide an accurate statement of the law. In addition, when the prosecutor claimed that Lewis had not presented evidence regarding intent, the judge informed the jury that the defendant was not required to present any proof on this element of the offense. Similarly, when the government noted that Lewis had not called his wife to the stand, the trial judge correctly stated that the defendant did not have to call any witnesses and that the prosecution could have subpoenaed Ms. Lewis. We find that any error was harmless.

■■ The prosecution also maintained in its closing statements that the evidence showed that Lewis thought McCahey's personal account mentioned in the letter was open. Not only was the evidence unclear as to Lewis's understanding of the status of the account, but his counsel also failed to object. Under the "plain error" rule, we find that these statements, if they were improper, in no way resulted in a "miscarriage of justice."

■■ It does appear that, by its frequent reference to the Tylenol murders, the prosecution was playing on the fear and sympathy of the jury. However, because Lewis elected in the letter sent to Johnson & Johnson to pose as the killer and to capitalize on the inevitable terror and confusion generated by these crimes, discussion of the poisonings was obviously extremely difficult, if not impossible, to avoid. The circumstances surrounding the killings pervaded every aspect of the case. They, for example, explained the opportunity for and

---

**10.** The trial judge initially told the jury that the evidence showed that the defendant fled from Chicago. However, the court immediately recalled the jury and explained that the "movement of Mr. Lewis from Chicago to New York is not the evidence of flight that the government introduced at all" and that it was the defendant's flight in New York that was at issue. Thus, the jury was properly informed as to the nature of the evidence.

the contents of the letter, its effect on the victim, and the responses of the authorities and the public. It was made abundantly clear that the defendant was not on trial for murder. In addition, Lewis failed to object to most of the references. We cannot say that these allusions to the murders, either individually or in the aggregate, "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 54 U.S.L.W. 4734, 4738 (U.S. June 23, 1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868 (1974)), much less that they resulted in a miscarriage of justice, especially in view of the overwhelming evidence in support of the conviction.

In conclusion, the arguments of the prosecutor, to the extent that they were improper, do not constitute a ground for overturning the conviction.

### III

For the reasons stated above, the judgment of conviction is AFFIRMED.